Docket No. 96457–Agenda 5–May 2004.

In re
 ARTHUR H., JR., A Minor (The People of the State of Illinois, Appellant, v. Arthur H., Sr., Appellee).

Opinion filed October 28, 2004.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

The circuit court of Winnebago County adjudicated Arthur H., Jr. (Arthur Jr.), a neglected minor and made him a ward of the court. A majority of the appellate court reversed the finding of neglect and remanded this cause to the circuit court for a dispositional hearing. 338 Ill. App. 3d 1027. For the reasons that follow, we affirm the holding of the appellate court reversing the finding of neglect with respect to Arthur Jr. We reverse the appellate court’s judgment remanding this cause to the circuit court.

BACKGROUND

Lorraine H. (Lorraine) is the mother of five children: Niya N. (born July 18, 1994), Arthur H., Jr. (born November 30, 1996), Jaquane H. (born May 22, 1998), Lora H. (born July 20, 1999), and Earl H. (born May 21, 2000). The instant appeal involves only Arthur H., Jr., and is brought by his biological father, Arthur H., Sr. (respondent).

On March 23, 2001, the Department of Children and Family Services (DCFS) took emergency temporary custody of the four children who were found in Lorraine’s home on that date. The State filed a three-count petition alleging that these children were neglected because they resided in an injurious environment which placed them at risk of harm, pursuant to section 2–3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2–3(1)(b) (West 2000)). The petition asked the circuit court to declare the children wards of the court. Arthur Jr. was not present in Lorraine’s home at the time that DCFS took temporary protective custody of her other four children, and he was not named in the petition to adjudicate wardship.

 Count I of the petition alleged that the minors’ environment was injurious to their welfare and that they were placed at a risk of harm because their “sibling had a hernia approximately 2½ to 3 inches in diameter and the mother had previously failed to follow the doctor’s treatment and administer medication.” Count II alleged that the children were in an injurious environment and faced a risk of harm because “the minors were dirty and wearing dirty clothing that smelled of urine, and the minor’s [
sic
] sibling was allowed to drink from a dirty bottle with curdled milk in it.” Finally, count III of the petition alleged that the minors’ “sibling displayed lethargy, an inability to move, imbalance, jittery eyes, and neck twitches,” which created an injurious environment placing the children at risk of harm.

On that same day, the circuit court held a temporary shelter care hearing with respect to the State’s petition. The circuit court found, based upon Lorraine’s stipulation to the allegations in the petition, that there was probable cause to believe that each of the four children named in the petition was a neglected minor. Thereafter, a discussion commenced with respect to Lorraine’s fifth child, Arthur Jr., and the following colloquy ensued:

“[Assistant State’s Attorney Biagi]: [T]here is a further minor who is not presently in the State of Illinois and was not in the State of Illinois at the time that protective custody was taken. His name is Arthur H[]. *** His father’s name is Arthur H[], Sr. And what we would be looking for is an order against the mother that any contact with that minor be the same restrictions as with these minors, and we also would be seeking an order of cooperation with the mother for locating that minor ***.

THE COURT: Clarify for me, does Arthur reside with someone in Milwaukee or was Arthur just in Milwaukee at the time that protective custody was taken of the other four in that he was to come back to Rockford and live with mom except under these circumstances?

MS. GLORIA [DCFS investigator]: I came to the home the first time and [Lorraine] said that the minor was in Milwaukee and she didn’t know when he’s gonna come back, he was residing–he is residing with his father and she doesn’t have a way to get him back because she doesn’t have transportation. *** I found out *** the child is residing with father and the father is asking for custody of this child in the court in Milwaukee, a thing that I did not know through Lorraine. She didn’t inform me of that. That’s all I know.

THE COURT: I guess I would ask all parties to cooperate in attempting to locate Arthur H[], Sr. and Jr., would direct the State to prepare a petition on Arthur so I have jurisdiction over Arthur, which I do not have at this time. I would ask you to get that on file by the close of business today.”

In addition to 
sua sponte
 ordering the assistant State’s Attorney to prepare and file a neglect petition with respect to Arthur Jr., the court further ordered that the parties cooperate in locating the child. The temporary shelter care hearing was then continued until March 29, 2001.

Pursuant to the order of the circuit court, later in the day on March 23, 2001, the State filed a three-count neglect petition captioned “In the Interest of Arthur H., Jr.” This petition contained allegations of neglect identical to those contained in the petitions filed with respect to Lorraine’s other four children. In addition, this petition also alleged that Arthur Jr. was 4 years of age, that his “place of residence is Winnebago County, Illinois,” and that Arthur Jr. “is presently in the custody of the Department of Children & Family Services.” The petition listed respondent, “Arthur H[ ],” as Arthur Jr.’s father, and stated that respondent resided in Milwaukee, Wisconsin.

On March 29, 2001, the court resumed the temporary shelter care hearing. Nancy Rice, an investigator for DCFS, informed the court that it was her belief that Arthur Jr., was living in Milwaukee with his father. However, Lorraine was unable to provide the address of respondent’s residence in Milwaukee. Rice also stated that respondent was one of three fathers of Lorraine’s children who lived in Milwaukee, and that Lorraine was also unable to provide the addresses of the other two fathers as well. The court then inquired of Lorraine as to the whereabouts of Arthur Jr. Lorraine told the court that Arthur Jr., was in Milwaukee with his father, but that she did not know their address. She explained that when she went to Milwaukee, she stayed at her mother’s home, and she only saw respondent when he came to that location; Lorraine did not visit respondent’s home. The circuit court judge found Lorraine in direct contempt of court for withholding information about Arthur Jr., and for failing to cooperate with DCFS in locating him. The court ordered that Lorraine was to remain in custody until Arthur Jr., was located.

On March 30, 2001, the parties reconvened in court for a status hearing. Christina Gloria, a DCFS investigator, stated that she had spoken to Lorraine’s mother in Milwaukee, and the mother stated that she would “go and look for Arthur.” The court was also informed that DCFS had found an address for respondent in Milwaukee. The court requested that it be informed when Arthur Jr., was located, and remarked that Lorraine was being held in custody “because we don’t have [Arthur Jr.]. And I’m not going to release her until he is found and his safety is evaluated.”

On April 3, 2001, Nancy Rice of DCFS informed the court that she had a telephone conversation with respondent. According to Rice, respondent stated that Arthur Jr., had been with him in Jackson, Mississippi, for the past three weeks, where respondent had been tending to his own ailing father. Rice also informed the court that respondent told her that Arthur Jr. had lived with him since the child was eight months old, and that the child only visited with Lorraine on occasion. The court set a pretrial conference for May 25, 2001, and ordered that respondent appear in court on that date with Arthur Jr. The record also indicates that respondent had not been served prior to this date. The court then released Lorraine from custody.

On April 24, 2001, DCFS prepared a service plan for Lorraine and the four children taken into temporary custody. The service plan detailed the progress of the four children and Lorraine since the time the children were removed from Lorraine’s home, and contained recommendations for services for the family. The service plan contained virtually no mention of Arthur Jr., it did not list him as being a member of Lorraine’s household, and it did not direct any tasks or services for him.

When court reconvened on May 25, 2001, DCFS investigator Teresa Munson stated that Arthur Jr., was with his father in Milwaukee, and that she “assumed that was okay.” The court immediately issued a juvenile custody warrant for Arthur Jr., noting that “the instructions to the last caseworker were to make contact with Arthur Sr., Arthur Jr. in Milwaukee and make sure that Arthur Jr.’s placement was a safe and stable placement. That has not been done.” The juvenile custody warrant alleged that “the conduct of and behavior of the minor may endanger the health, person, welfare or property of himself or others,” that “the circumstances of his/her home environment may endanger his/her health, person, welfare or property,” and that “there is reasonable cause to believe the minor has absconded from his/her place of residence.” The warrant instructed the sheriff to take the minor into custody.

The court also set a new pretrial conference date for August 10, 2001, and noted that “[b]ecause we were unaware of Arthur, Jr., when a temporary shelter care was held [
sic
], there is no temporary custody order transferring [guardianship and custody] to DCFS. Maybe that is why there is some confusion with the department with the discretion to place with relative placement or foster care.” The court then entered a written order placing guardianship and custody of Arthur Jr. with DCFS.

On June 27, 2001, the parties reconvened for a status hearing. The court was informed by the State that Arthur Jr., had been taken into custody in Milwaukee, Wisconsin, when respondent brought the child to the local police station. The assistant State’s Attorney represented that “[t]he child is in foster care. You gave [guardianship and custody] to DCFS at the last court date.” The court entered a written order quashing the juvenile custody warrant, and instructed that summons be issued to respondent.

On August 10, 2001, the parties appeared for a pretrial conference. Respondent was present in court, and was provided with a copy of the petition for adjudication of wardship. In addressing respondent, the circuit court noted that “[t]he allegations in the petition are all directed at conduct on the part of Arthur’s mother, Lorraine. There’s nothing in here that is directed specifically towards you.” The court then continued the pretrial conference.

On October 25, 2001, the parties were back in court. During discussions, it was noted by counsel that the “counts in the petition are ambiguous as to exactly whom the allegations are towards,” and requested that the State clarify the counts prior to pretrial. The State responded that it “would file the amended petition *** and would make the counts less ambiguous.”

On December 18, 2001, it was represented to the court that a preliminary home study had been done in Wisconsin that indicated that Arthur Jr.’s clothes and toys were at respondent’s home. Counsel for respondent stated that this appeared to confirm the fact that Arthur Jr. had resided primarily with respondent and had occasionally visited Lorraine.

On January 30, 2002, the State filed a three-count amended petition for adjudication of wardship with respect to all five children. Counts I and III of the amended petition were identical to the corresponding counts in the original petition, alleging that the children were neglected because they were subject to a risk of harm due to their injurious environment, pursuant to section 2–3(1)(b) of the Act (705 ILCS 405/2–3(1)(b) (West 2000)). The only change made in the petition was to count II. Previously, this count alleged that the minors were placed at risk of harm due to an injurious environment. After amendment, the count alleged that the minors were placed at a risk of harm due to inadequate supervision, pursuant to section 2–3(1)(d) of the Act (705 ILCS 405/2–3(1)(d) (West 2000)), “in that the minor’s mother left the minor in the care of a 14 year old for an unreasonable amount of time and the minor’s [
sic
] were dirty and were wearing dirty clothes that smelled of urine, and the minor’s [
sic
] sibling was allowed to drink from a dirty bottle [containing] curdled milk.”

On May 23, 2002, the trial court held an adjudicatory hearing on the State’s amended petition. The State’s first witness was Angela Harris, a child protection investigator with DCFS, whose testimony related solely to a DCFS investigation of Lorraine which occurred several months prior to the series of events leading up to the filing of the instant petition for adjudication of wardship. Harris testified that DCFS received a hotline call on August 15, 2000, that Lorraine, without the authorization of a physician, had removed her son Earl from his apnea monitor. Harris stated that, in addition, the caller alleged that Lorraine had missed Earl’s doctor’s appointments for the apnea clinic. Within 24 hours of the call, Harris went to Lorraine’s home to investigate the allegations.

Harris testified that on that occasion, all five of Lorraine’s children, including Arthur Jr., were in her home. According to Harris, at the time of the visit, the children were all appropriately dressed and were watching television and playing. Harris testified that Lorraine admitted that she had removed Earl from the apnea monitor. However, when Harris explained the importance of the monitor, Lorraine reattached it to Earl. Harris further testified that Loraine stated that she missed the apnea clinic appointments because she had no transportation to the clinic. Harris stated that she made some referrals to help Lorraine get to the doctor’s appointments. According to Harris, the children were not removed from Lorraine’s home at that time because Lorraine had links and support within the community. Harris explained that there were three other agencies which had access to Lorraine’s home to see her, and to make sure that Earl was getting the medical help that he needed. Harris further testified that she was unaware of any hernia problem with respect to Earl. Harris did not testify as to whether the visit led to an “indicated” report.

As its next witness, the State called Christina Gloria, another DCFS investigator. Gloria testified with respect to the events immediately leading up to the State’s filing of the petition for adjudication of wardship at issue in this case. On February 7, 2001, Gloria investigated an allegation of medical neglect against Lorraine. According to Gloria, when she went to Lorraine’s apartment, all of Lorraine’s children were present except for Arthur Jr., who was living with respondent in Milwaukee. At the time of her visit, Gloria observed that Earl “was alert, smiling,” and that he “appeared to be developmentally on target.” However, she also observed stains on his shirt. Gloria’s examination of Lorraine’s home revealed that, although the home’s kitchen was clean, there was “garbage” in the home, which Gloria described as “dirty diapers folded on the floor.”

Gloria testified that she spoke to Lorraine about Earl’s apnea monitor and whether his immunizations were current. According to Gloria, Lorraine told her that the doctor stated that Earl was to use the apnea monitor until he was six months old. Because Earl had reached eight months of age, Lorraine discontinued using the device. Gloria also stated that Lorraine told her that she was getting ready to take the children to the doctor to get their immunizations. Gloria testified that prior to meeting with Lorraine, she reviewed Lorraine’s case file, and discovered that the prior DCFS investigation by Harris ended in an “indicated” report. Gloria stated that, before she left Lorraine’s home on that day, she told Lorraine to arrange to have the children immunized.

Gloria testified that, about one month later, on March 13, 2001, she returned to Lorraine’s home to investigate information that Lorraine had not taken Earl to get his immunizations. According to Gloria, Lorraine stated that she could not take the children to the doctor because she did not have transportation. Gloria testified that, during that visit, she observed that Earl’s shirt was dirty and that he “was kind of wheezing.” In addition, Gloria noted that the kitchen had an odor of urine. Lorraine told Gloria that some of the pipes had broken, and that someone was scheduled to come out and fix them. Gloria testified that she decided to get Lorraine a family educator, who would link Lorraine to resources of help within the community. There was no testimony that Arthur Jr., was present in the home at this time.

Two days later, on March 15, 2001, Gloria returned to Lorraine’s home with a family educator. Gloria testified that the purpose of this visit was to introduce Lorraine to the family educator and inform her about the family educator’s role. In addition, Gloria had made a doctor’s appointment for Earl. Gloria stated that she instructed the family educator to transport Lorraine and Earl to the appointment, make sure that Lorraine scheduled a follow-up visit, and ascertain that Lorraine understood what had to be done. Again, there was no testimony that Arthur Jr., was present in the home at this time.

Gloria testified that she returned to Lorraine’s home on March 21, 2001, because Lorraine did not follow through with a doctor’s appointment for Earl. Gloria stated that, on that day, Arthur Jr. was not in Lorraine’s home. Upon arriving at the home, Gloria discovered that Lorraine had left the four children in the care of a boy who was 14 years of age. The boy stated that Lorraine had left to buy diapers. Gloria testified that, on this occasion, Earl was dirty and wore a soiled diaper, and the boy was giving him a dirty bottle with curdled milk. Another child, Niya, smelled like urine and her clothes were very dirty. Gloria testified that she waited in the home for 40 minutes, but that Lorraine did not return. Gloria stated that she then took the four children into protective custody and transported the children to the DCFS office. When they were at the office, Gloria noticed that Niya was acting lethargic and did not have balance. The children were then immediately given a physical examination. Gloria stated that she was present when the doctor examined Earl, and that she observed a protrusion out of his belly button about the size of a lemon.

At the conclusion of Gloria’s testimony, she was asked by the State about the difficulty that DCFS had in locating Arthur Jr. The following colloquy took place:

“[Assistant State’s Attorney Currie]: Okay. Can you please describe the difficulty that you had in locating Arthur Jr.?

MR. RARIDON [attorney for respondent]: Well, judge, I would object at this point. There’s been no testimony that he was present at any of these occurrences.

MS. HUGHES [attorney for Lorraine]: Judge, it’s also not relevant to this petition.

THE COURT: Counsel, why are you going into it?

MS. CURRIE: I just wanted to indicate he was part of this family and that normally he was in mom’s custody and care, but–I can–

THE COURT: Well, but you haven’t established that, and asking this question doesn’t establish that.

MS. CURRIE: Okay.

THE COURT: I’m going to sustain *** the objection.”

The State rested after introducing copies of Earl’s medical records into evidence.

At the close of the State’s case, Lorraine’s attorney moved for a directed verdict as to counts I and III of the amended petition. With respect to count I, counsel argued that the State did not meet its burden to show that the minors were placed at risk of harm due to a hernia as to which the mother failed to follow doctor’s treatment advice. Counsel argued that the State presented no evidence that Earl had a hernia, or that Lorraine failed either to follow a doctor’s treatment advice or to administer medication with respect to a hernia. As to count III, counsel argued that the only evidence that Niya displayed imbalance and lethargy came from Gloria. Thus, counsel asserted, the State also failed to meet its burden of proof on that count.

The State responded that count I addressed not only the presence of the hernia, but also Lorraine’s failure to follow through with Earl’s apnea treatment. The State did admit, however, that the wording in count I was “a bit vague” and “unclear.” The State did not respond to the arguments made by Lorraine’s counsel with respect to count III of the amended petition. The circuit court reserved ruling on the motion, pending examination of Earl’s medical records.

The attorney for respondent then moved to dismiss the amended petition in its entirety as it related to his son, Arthur Jr. Counsel first argued that although the petition stated that Arthur Jr.’s place of residence was Winnebago County, Illinois, the State had failed to offer any proof to support this assertion. To the contrary, counsel argued, the only testimony adduced by the State was that Arthur Jr. resided with his father in Milwaukee. Thus, counsel asserted, the State failed to prove that Arthur Jr. had residence in Illinois, and, therefore, the jurisdiction of the court had not been established. Counsel further argued that the State had failed to present evidence to show that the environment of Arthur Jr. was injurious to his welfare, because there was no evidence adduced by the State that Arthur Jr. was in the environment during any of Gloria’s visits to Lorraine’s home. The circuit court denied the motion.

Lorraine then testified briefly on her own behalf. She stated that Earl had apnea monitor appointments every two weeks at a clinic. Lorraine admitted that she missed some doctor’s appointments, but explained that it was because she lacked a baby-sitter and transportation.

 The next witness to testify was respondent. According to him, at the time Arthur Jr. was born, he and Lorraine lived together in Milwaukee. However, when Arthur Jr. was approximately six months old, he and Lorraine separated, and Arthur Jr. had resided with him since that time. Respondent testified that he told Lorraine he wanted custody of Arthur Jr. and that he would take care of their son. According to respondent, he and Lorraine had an arrangement where he was the primary caretaker of Arthur Jr. with the child visiting with Lorraine for a total time of about three months of the year. Respondent admitted that there are no court documents giving him guardianship and custody of Arthur Jr.; that he and Lorraine had a voluntary arrangement; and if Lorraine wanted to take Arthur Jr., she could. Respondent stated that Arthur Jr. was not in Rockford with Lorraine in August 2000 at the time of the first DCFS investigation conducted by Angela Harris. Respondent also testified that between July 2000 and March 2001, Lorraine had no contact with Arthur Jr.

Upon questioning from the court, respondent testified that he signed an acknowledgment of parentage of Arthur Jr. in Wisconsin. Respondent also stated that Lorraine had filed suit in Wisconsin against him for child support, but that her claim was dismissed because Arthur Jr. resided with him, and he was taking care of him. According to respondent, Arthur Jr. lived in Milwaukee with him, his fiancé Allean Williams, and her two children. Respondent further testified that he, Allean and his mother Bobby were involved in caring for Arthur Jr. on a day-to-day basis.

The circuit court, on its own motion, then recalled Lorraine to the witness stand. Lorraine stated that Arthur Jr. had lived with respondent since the child was eight months old. It was around that time, in March 2000, that she moved from Milwaukee to Illinois. Lorraine testified that Arthur Jr. goes “back and forth” between her and respondent, with each parent keeping the child for a few months. She stated that, in August 2000, when DCFS first came to her home, Arthur Jr. was present. Lorraine testified that Arthur Jr., “spent most of his time with his dad” in Milwaukee, but then stated that Arthur Jr. spent an equal amount of time living with each parent.

 Respondent then called his mother, Bobby H., as a rebuttal witness. Bobby H. testified that Arthur Jr. resided primarily with respondent in Milwaukee, and that the child would generally stay with Lorraine for approximately one week at a time, and then return to Milwaukee to live with his father. Bobby H. stated that she saw Arthur Jr. almost every day and was regularly involved with baby-sitting him.

The parties then presented closing arguments. The State asserted that it had “shown all of the elements in count I, that the minor did have a hernia and that the mother had previously failed to follow doctor’s recommendations as far as administering the medication.” Also, the State argued that it had met its burden of proof with respect to counts II and III. Counsel for respondent renewed his earlier contention that the State failed to establish that Arthur Jr. resided in Illinois; that Arthur Jr. was in any way involved in the injurious environment to which the other children may have been subjected; and that the State had no jurisdiction over a child residing in Wisconsin. Counsel argued that the State had failed to adduce any testimony that Arthur Jr., was exposed to the conduct alleged in counts I, II or III of the amended petition, and asserted that the court could not presume such exposure. At the conclusion of argument, the circuit court took the case under advisement.

Following a brief recess, the circuit court announced its ruling. As an initial matter, the court granted Lorraine’s motion for a directed finding as to count III of the amended petition in each of the cases. Accordingly, that count is not at issue in the matter before us.

The circuit court, however, denied the motion to dismiss counts I and II of the amended petition. The court then made the following findings of fact. The circuit court found that the evidence showed that all of Lorraine’s five children, with the exception of Arthur Jr., had lived fulltime with her in Rockford. The court also found that Arthur Jr. spent “substantial” time living with Lorraine in Rockford, and that Lorraine and respondent have an “informal shared joint parenting arrangement.” However, the court then made the following observation: “Frankly, the court is not certain as to exactly how much time Arthur spends with his mother and/or with his father,” noting conflicts in the testimony between Lorraine and respondent. Nevertheless, the court then found that “somewhere in between there lies exactly how much time Arthur H., Jr. spends with each of them.” Because neither parent had any legal documentation setting forth a custodial arrangement or granting to him or her sole custody of Arthur Jr. the court “proceeded on the assumption that they have an agreement worked out between the two of them that they are sharing jointly the custody of this child.” Therefore, the court was “of the opinion that the contacts that Arthur has with the State of Illinois extend the jurisdiction of this court over him.”

The court then found that the evidence showed that Earl was prescribed a sleep apnea monitor and that Lorraine failed to use that monitor. The court also found that Lorraine failed to follow up with medical care in relation to the monitor and Earl’s sleep apnea, and held that this failure endangered Earl. Finally, the court held that Earl was endangered because Lorraine failed to provide him with necessary immunization shots.

In addition, the court held that the environment in Lorraine’s home was neither clean nor healthy. The children were dirty and smelled of urine, and there were used diapers on the floor. The court determined that this environment placed the children at risk of harm. Based upon these findings, the circuit court held that, with respect to Earl, the State established by a preponderance of the evidence that he was a neglected minor as alleged in counts I and II of the amended petition. However, the court also found that

“there is no neglect in relation to this alleged hernia. There is no evidence presented to the court that would convince this court that the hernia, if the child has a hernia, required any immediate medical care or took attention. So, the argument that’s been made is that count I doesn’t cover the failure to provide other medical care other than for this alleged hernia, and I am finding that it does, that that count pleads a sufficient cause of action to cover the failure to get the treatment for the sleep apnea and also the failure to get the necessary immunizations.”

With respect to the other four children, the court held that the State met its burden of proof by the preponderance of the evidence that those children were also neglected minors under counts I and II of the amended petition.

On May 31, 2002, the circuit court conducted a dispositional hearing. The court entered a dispositional order finding that Lorraine was unfit to care for her children, and that it was in the best interest of the minors to be removed from her custody. The court made all five children wards of the court, and granted guardianship and custody of the children to DCFS with the discretion to place the children with a responsible relative or in traditional foster care.

Respondent filed a timely appeal. On appeal, respondent contended that the circuit court’s finding that Arthur Jr. was a neglected minor was against the manifest weight of the evidence. Respondent requested the appellate court to reverse the circuit court’s finding and dismiss the amended petition alleging that Arthur Jr. is a neglected minor.

A majority of the appellate court reversed the judgment of the circuit court and remanded this cause with directions for a new dispositional hearing. 338 Ill. App. 3d 1027. The majority first determined that the evidence of sibling neglect presented by the State at the adjudicatory hearing was sufficient to support a finding of neglect under count I against Lorraine with respect to Arthur Jr. The majority further held, however, that this same evidence was insufficient to support a finding of neglect against respondent. According to the majority, “although the [Juvenile Court] Act seems to treat both parents as a unit, the trial court may make a neglect finding and adjudicate wardship of a minor as to one parent while not finding neglect as to the other parent.” 338 Ill. App. 3d at 1034. Thus, according to the majority, both parents must be found to be neglectful before a child may be adjudicated neglected.

The majority held, under the facts presented in the instant cause, that there was no evidence that respondent ever neglected Arthur Jr.; that Earl is not the child of respondent, and, therefore, he is not responsible for Earl; and that Arthur Jr., was with respondent and not present at Lorraine’s home during the series of visits by DCFS beginning in February 2001, which formed the basis of the State’s allegations of neglect. Thus, the majority held that under the facts here, the State’s theory of “anticipatory neglect” under count I of the amended petition did not apply against respondent because Arthur Jr. was not present in Lorraine’s home during the alleged instances of neglect.

In addition, the majority found a second, independent basis for reversal of the circuit court’s judgment with respect to count I of the amended petition. The court held that the State’s proof at adjudication did not conform to the pleadings, thereby failing to provide respondent with adequate notice of the theory upon which the State intended to proceed. The majority noted that count I of the amended petition alleged that Arthur Jr.’s environment was injurious to his welfare because his sibling “had a hernia approximately 2½ to 3 inches in diameter and the mother had previously failed to follow the doctor’s treatment and administer medication.” The majority found it significant that the circuit court refused to find that Earl was neglected on the basis of the alleged hernia because the State failed to produce any evidence to support this allegation. The circuit court instead found that Earl was a neglected minor because Lorraine failed to use the apnea monitor and failed to have Earl immunized. The majority observed, however, that the amended petition did not allege that Earl was neglected because Lorraine failed to use the apnea monitor or have the children immunized. Because the petition did not mention these occurrences, the majority refused to read these allegations into the petition.

Finally, with respect to count II of the amended petition, the majority also reversed the judgment of the circuit court. The majority found that the State had not met its burden of proof to show that Arthur Jr. was present in Lorraine’s home at the time the other four children were left unsupervised. Although the State tried to save this count by suggesting that the circuit court’s ruling was based upon a theory of anticipatory neglect, claiming that Arthur Jr. “spent a substantial amount of time with his mother[,] who was found to have left four children unsupervised in poor conditions,” the majority held that this argument was insufficient to support a finding of neglect as to respondent.

The majority stressed that its ruling did not reverse the trial court’s finding of neglect as to Lorraine, which the majority held was supported by the evidence. In light of the decision to reverse the finding of neglect as to respondent, the majority remanded this cause for a new dispositional hearing, noting that two years had passed since Arthur Jr. was taken from respondent.

In dissent, Justice Kapala wrote that the majority erred by assessing responsibility for neglect between the parents at the adjudicatory stage. The dissenting justice explained that, at the adjudicatory stage of the proceedings, parents are not adjudicated neglectful; rather, minors are adjudicated neglected. Thus, according to the dissent, the trial court need not determine that 
both
 parents engaged in acts or omissions of neglect in order to find that a minor is neglected. Rather, proof by a preponderance of the evidence that Arthur Jr. was neglected by anyone responsible for his welfare is sufficient to adjudicate him a minor who is neglected under the Act. Relying upon 
In re B.C.
, 262 Ill. App. 3d 906 (1994), the dissenting justice determined that Arthur Jr. was neglected due to the risk of harm attendant to Lorraine’s ability to remove the child from respondent at any time, and the possibility of this removal left the child subject to the neglect suffered by his siblings. Further, the dissenting justice believed that count I of the amended petition contained the theory that Lorraine failed to attach the apnea monitor to Earl, and the allegations in that count could be fairly construed to include the failure to keep Earl on the apnea monitor.

We granted the State’s petition for leave to appeal. 177 Ill. 2d R. 315. We also granted the office of the Cook County public guardian leave to submit an 
amicus curiae 
brief in support of the State.

ANALYSIS

The step-by-step process used to decide whether a child should be removed from his or her parents and made a ward of the court is set forth in the Juvenile Court Act of 1987 (705 ILCS 405/1–1 
et seq.
 (West 2000)). Upon the filing of a petition for wardship by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2–10 (West 2000).

Following placement of a child in temporary custody, the circuit court must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship. 705 ILCS 405/2–21 (West 2000); 
In re N.B.
, 191 Ill. 2d 338, 343 (2000). Section 2–3(1)(b) of the Act (705 ILCS 405/2–3(1)(b) (West 2000)) defines a “neglected minor” to include “any minor under 18 years of age whose environment is injurious to his or her welfare.” Section 2–3(1)(d) of the Act (705 ILCS 405/2–3(1)(d) (West 2000)) also provides that a “neglected minor” is “any minor under the age of 14 years whose parent or other person responsible for the minor’s welfare leaves the minor without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of that minor.”

Generally, “neglect” is defined as the “ ‘failure to exercise the care that circumstances justly demand.’ ” 
In re N.B
, 191 Ill. 2d at 346, quoting 
People ex rel. Wallace v. Labrenz
, 411 Ill. 618, 624 (1952); see also 
In re Edricka C.
, 276 Ill. App. 3d 18, 25 (1995). However, this does not mean that the term “neglect” is limited to a narrow definition; to the contrary, “neglect,” by necessity, has a fluid meaning. As this court has previously explained,

“ ‘[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes.’ ” 
In re N.B.
, 191 Ill. 2d at 346, quoting 
Labrenz
, 411 Ill. at 624; see also 
In re J.M.
, 245 Ill. App. 3d 909, 920 (1993).

Similarly, the term “injurious environment” has been recognized by our courts as an amorphous concept that cannot be defined with particularity. 
In re N.B.
, 191 Ill. 2d at 346; 
In re J.P.
, 331 Ill. App. 3d 220, 234 (2002); 
In re Z.Z.
, 312 Ill. App. 3d 800, 804 (2000). In general, however, the term “injurious environment” has been interpreted to include “the breach of a parent’s duty to ensure a ‘safe and nurturing shelter’ for his or her children.” 
In re N.B.
, 191 Ill. 2d at 346, quoting 
In re M.K.
, 271 Ill. App. 3d 820, 826 (1995).

Accordingly, cases involving allegations of neglect and adjudication of wardship are 
sui generis
, and must be decided on the basis of their unique circumstances. 
In re N.B.
, 191 Ill. 2d at 346; 
In re Christina M.
, 333 Ill. App. 3d 1030, 1034 (2002). This analytical principle underscores the “fact-driven nature of neglect and injurious environment rulings.” 
In re N.B.
, 191 Ill. 2d at 346.

A proceeding for adjudication of wardship “represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.” 
In re Harpman
, 134 Ill. App. 3d 393, 396-97 (1985). It is the burden of the State to prove allegations of neglect by a preponderance of the evidence. 
In re Christina M.
, 333 Ill. App. 3d at 1034. In other words, the State must establish that the allegations of neglect are more probably true than not. 
In re N.B.
, 191 Ill. 2d at 343; 
In re M.H.
, 196 Ill. 2d 356, 365 (2001). On review, a trial court’s ruling of neglect will not be reversed unless it is against the manifest weight of the evidence. 
In re M.Z.
, 294 Ill. App. 3d 581, 592 (1998). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. 
In re Edward T.
, 343 Ill. App. 3d 778, 794 (2003).

If the State fails to prove the allegations of abuse, neglect or dependence by a preponderance of the evidence, the court must dismiss the petition. 705 ILCS 405/2–21(1) (West 2000); 
In re N.B.
, 191 Ill. 2d at 343. A finding of abuse, neglect or dependence is jurisdictional, “ ‘without [which] the trial court lacks jurisdiction to proceed to an adjudication of wardship.’ ” 
In re M.B.
, 235 Ill. App. 3d 352, 377 (1992), quoting 
In re Shawn B.
, 218 Ill. App. 3d 374, 380 (1991). If, however, the State satisfies its burden of proof, the circuit court must then proceed to the second adjudicatory stage, in which the court determines whether “it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court.” 705 ILCS 405/2–21(2) (West 2000). “In any proceeding initiated pursuant to the Juvenile Court Act of 1987, including an adjudication of wardship, the ‘paramount consideration’ is the best interest of the child.” 
In re N.B.
, 191 Ill. 2d at 343, quoting 
In re K.G.
, 288 Ill. App. 3d 728, 734-35 (1997).

Turning to the matter before us, the State first contends that the analysis employed by the appellate court majority was fundamentally flawed. According to the State, the majority incorrectly read an unwritten requirement into the Act that in order to find a child to be neglected, the circuit court must assess the blame of each parent. The State contends that because a finding of neglect concerns only the status of the minor, and not the status of the parent, the appellate majority’s analytical focus was misdirected.

In his brief to this court, respondent agrees with the State’s contention that the appellate majority erred in bifurcating the finding of neglect between the parents. Respondent emphasizes that he did not advocate this “bifurcation” theory to the appellate court. To the contrary, respondent stresses that, on appeal, he challenged the circuit court’s finding that Arthur Jr. was a neglected minor, and did not appeal the finding of neglect only as it pertained to him. Respondent agrees with the State that, at the adjudicatory stage, the court’s focus is placed solely upon the minor, not upon the parents.

We agree with both the State and with respondent that the ruling of the appellate majority on this specific point is in error. We find that the majority’s holding, that in order to find a minor neglected at the adjudicatory stage both parents, or all persons responsible for the welfare of the minor, must engage in acts or omissions that constitute neglect, is contrary to the provisions of the Juvenile Court Act.

The legislature has stated that the purpose of an adjudicatory hearing is “to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.” 705 ILCS 405/1–3(1) (West 2000). The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected. The legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child’s neglect, and to assess the proportion of blame with respect to such individuals. See 
In re R.B.
, 336 Ill. App. 3d 606, 614-15 (2003); 
In re Christina M.
, 333 Ill. App. 3d at 1034.

In addition, in defining a neglected child in section 2–3 of the Act, the legislature focused exclusively upon the status of the child, and gave no consideration to an evaluation of the acts and/or omissions of the child’s parents, or any other individual responsible for the welfare of the child, in arriving at a determination of neglect. 705 ILCS 405/2–3(1)(a) through (1)(d) (West 2000).

Finally, in section 2–21 of the Act (705 ILCS 405/2–21(1) (West 2000)), the General Assembly set forth the procedure which the circuit court must follow in conducting an adjudicatory hearing under the Act:

“After hearing the evidence the court shall determine whether or not 
the minor
 is *** neglected ***. *** The court’s determination of whether 
the minor
 is *** neglected *** shall be stated in writing with the factual basis supporting that determination. (Emphases added.)

If the court finds that the minor is *** neglected ***, the court shall then determine and put in writing the factual basis supporting that the determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court’s findings. That finding shall appear in the order of the court.”

Thus, pursuant to section 2–21, the circuit court is first to determine whether the minor is neglected. There is no direction from the legislature that the court shall consider the actions of the parents in making this determination. It is only 
after
 the circuit court has adjudicated the child neglected that the statute directs the court to consider the actions of the parents. Even then, however, section 2–21 provides that the court need consider such actions only “to the extent possible.” The plain language of this provision indicates that the legislature recognized that there may occur circumstances when a child is neglected, but it may be impossible to determine the relative fault with respect to the child’s parents or guardians. However, even if such a determination is not possible, the statute is clear that this does not alter the finding that a child is “neglected.”

 Our holding that the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful, furthers the purpose and policy of the Juvenile Court Act, which is to ensure the best interests and safety of the child. 705 ILCS 405/1–2 (West 2000). A contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent’s conduct caused the neglect. The General Assembly could not have intended such absurd results. See 
In re R.B.
, 336 Ill. App. 3d at 615-616 (setting forth hypothetical scenarios to show that a determination of causation is irrelevant at the adjudicatory stage).

 As the matter at bar involved an adjudicatory hearing, the appellate majority’s analysis of the relative blame of each parent for the child’s neglect was improper. We agree with the dissenting justice below that “[t]he basic principle overlooked by the majority is that parents are not adjudicated neglectful at the adjudicatory stage of the proceedings under the Act; rather, minors are adjudicated neglected.” 338 Ill. App. 3d at 1042 (Kapala, J., dissenting); see also 
In re Christina M.
, 333 Ill. App. 3d at 1034.

Having decided that the only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful, we now turn to the next issue presented by this appeal: whether, under the unique facts of this case, the circuit court’s finding that Arthur Jr. is a “neglected” minor within the meaning of the Act is against the manifest weight of the evidence.

In the matter before us, the circuit court’s finding that Arthur Jr. is a neglected minor is premised upon the theory of anticipatory neglect. Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child. See 
In re L.W.
, 291 Ill. App. 3d 619, 623 (1997). The theory of anticipatory neglect flows from the concept of an “injurious environment” which is set forth in the Act. See 
In re L.W.
, 291 Ill. App. 3d at 623.

Although our appellate court has recognized the theory of anticipatory neglect for some time (see, 
e.g.
, 
In re Brooks
, 63 Ill. App. 3d 328, 339-40 (1978)), our courts have also held that there is no 
per se
 rule that the neglect of one child conclusively establishes the neglect of another child in the same household. 
In re S.R.
, 349 Ill. App. 3d 1017, 1021 (2004); 
In re Edricka C.
, 276 Ill. App. 3d at 18. Rather, “such neglect should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question.” 
In re Edward T.
, 343 Ill. App. 3d at 797; see also 
In re Edricka C.
, 276 Ill. App. 3d at 26; 
In re M.D.H.
, 297 Ill. App. 3d 181, 188-89 (1998). Although section 2–18(3) of the Act (705 ILCS 405/2–18(3) (West 2000)) provides that the proof of neglect of one minor “shall be admissible evidence” on the issue of the neglect of any other minor for whom the parent is responsible (
In S.R.
, 349 Ill. App. 3d at 1021), we emphasize that the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor. Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipatory neglect based upon the neglect of a child’s sibling, must be reviewed according to its own facts. 
In re Edricka C.
, 276 Ill. App. 3d at 28.

In the cause before us, the State contends that a finding of neglect with respect to Arthur Jr. is appropriate, based upon a theory of anticipatory neglect. According to the State, the facts in this case lead to the conclusion that Arthur Jr. was placed at a risk of harm, and, therefore, his environment was injurious. In support of its argument, the State relies chiefly upon 
In re B.C.
, 262 Ill. App. 3d 906 (1994), and asserts that 
B.C.
 is factually analogous to the matter at bar. The State asserts that it met its burden of proof to show that Lorraine’s neglect of Arthur Jr.’s siblings established an injurious environment with respect to Arthur Jr. despite the fact that the child principally resided with respondent and was not present during the occurrences upon which the State’s amended petition was based. The State emphasizes that Lorraine could remove Arthur Jr. from respondent at any time, and that this subjected the child to a risk of harm.

Contrary to the State’s position, respondent contends that the circuit court’s finding that Arthur Jr. is a neglected minor was against the manifest weight of the evidence. Respondent asserts that the State failed to meet its burden of proof to establish that Arthur Jr. was placed at a risk of harm. Although respondent acknowledges that the Act provides that proof of the neglect of one minor shall be admissible evidence with respect to the neglect of any other minor for whom the parent is responsible, respondent stresses that merely providing that such evidence is “admissible” does not mean that the evidence is sufficient to prove the allegation. In addition, respondent notes that the case of each minor must be examined individually.

Respondent further observes that the amended petition for adjudication alleged that Arthur Jr. was a neglected minor because his siblings were subjected to medical neglect and to a lack of supervision. According to respondent, the State presented no evidence that Arthur Jr. lacked medical care or that Arthur Jr. had been unsupervised. Respondent emphasizes that Arthur Jr. was living with him in Milwaukee and was not present at any of the five occasions which form the basis of the State’s petition. Respondent further asserts that the State failed to present any evidence concerning the degree of risk of harm to Arthur Jr. or any evidence with respect to the care and conditions he experienced at the time the court directed the State to file the petition for adjudication of wardship. Accordingly, respondent concludes, the circuit court’s finding that Arthur Jr. is a neglected minor within the meaning of the Act is against the manifest weight of the evidence. We agree.

We hold that, under the specific facts presented in the instant cause, the circuit court’s holding that Arthur Jr. was neglected under a theory of anticipatory neglect was against the manifest weight of the evidence. The record reveals that the State failed to meet its burden of proof to establish that Arthur Jr. was placed at a probable and substantial risk of harm as a result of the neglect of his siblings. As stated, each case involving allegations of neglect and adjudication of wardship is 
sui generis
, and must be decided on its own facts. 
In re N.B.
, 191 Ill. 2d at 346; 
In re Christina M.
, 333 Ill. App. 3d at 1034. Our review of the record in the matter at bar reveals that the record does not support the circuit court’s determination that Arthur Jr. was a neglected minor.

Both the State, in its brief to this court, and the dissenting justice below, rely upon the decision in 
In re B.C.
, 262 Ill. App. 3d 906 (1994) to support the circuit court’s finding of neglect in the instant cause. However, we find that the facts presented in the cause at bar are distinguishable from those in 
B.C.
 In 
B.C.
 the State filed a petition for adjudication of wardship alleging that B.C. and her two brothers were neglected because their environment was injurious to their welfare and placed them at a risk of harm. At the temporary custody hearing, the State presented evidence that the mother, while intoxicated, bit one of B.C.’s brothers on the arm when he refused her request to prepare a meal for her. The mother then disappeared. Approximately one month later, the mother was arrested, and, at that time, she was intoxicated. In addition, the State presented evidence that the mother had failed to take B.C.’s brother to his doctor’s appointments. At the time of these occurrences, B.C. was not living with the mother; rather, B.C.’s mother had previously left the child with her godmother without providing any instructions for B.C.’s care. The trial court found that probable cause existed to remove B.C.’s brothers from their mother’s care, but dismissed the petition as it related to B.C.

The appellate court reversed the circuit court’s dismissal of the petition for adjudication of wardship as to B.C. The court held that the fact that B.C. lived with her godmother at the time of the occurrences was irrelevant. The court emphasized that B.C.’s mother retained legal custody of the child and, therefore, could retrieve B.C. from the godmother at any time. The court held that “this possibility of removal left B.C. subject to the abuse and neglect endured by both [her brothers].” 
In re B.C.
, 262 Ill. App. 3d at 909.

The facts presented in 
B.C.
 are distinguishable for several reasons from those in the cause at bar. First, the 
B.C.
 decision analyzed a circuit court order rendered in a procedural posture different from that in the cause at bar. In 
B.C.
, the appellate court reviewed the propriety of a circuit court’s ruling at a temporary custody hearing conducted under section 2–10 of the Act (705 ILCS 405/2–10 (West 2000)). During a temporary custody hearing, the State need only establish that there is probable cause to believe that a child is neglected. This burden of proof differs from that at the adjudicatory stage, wherein the State must establish that the child is neglected by a preponderance of the evidence. Thus, in 
B.C.
 the State had a lower evidentiary threshold to meet than in the matter at bar.

Second, in 
B.C.
 the court determined that the fact that the child had temporarily resided with her godmother was of no consequence in determining whether the child was neglected, because the mother could remove the child from the godmother at any time. Under the unique facts presented in the cause at bar, the State has not shown, as was the case in 
B.C.
, that Lorraine may take Arthur Jr. away from respondent at any time.

The uncontradicted evidence presented at the adjudicatory hearing is that Arthur Jr.’s primary residence was in Wisconsin with respondent. This conclusion is buttressed by the fact that Lorraine filed an action against respondent for child support for Arthur Jr. and her action was dismissed because it was found that the child resided with respondent in Milwaukee. In addition, the uncontradicted testimony of all DCFS workers during these proceedings was that Arthur Jr. resided with respondent in Wisconsin. Further, Lorraine herself testified that Arthur Jr. spent most of his time with respondent in Milwaukee, but that she did not know where her son and respondent lived. Indeed, the circuit court held Lorraine in contempt because she could not provide the addresses of any of the fathers of her children who resided in Milwaukee, including respondent. In addition, the record is uncontradicted that Lorraine lacked transportation. The record reveals that Lorraine had no transportation to travel to and from neighborhood clinic appointments; it is therefore likely that she also would lack transportation to travel nearly 100 miles, across state lines, to retrieve Arthur Jr. from respondent.

Moreover, and perhaps most importantly, what distinguishes 
In re B.C. 
factually from the cause at bar is the legal relationship that respondent has with Arthur Jr. In 
B.C.
 the court found it significant that the godmother had no legal right to prevent the mother from removing the child from her care. In contrast, in the matter at bar, it is uncontradicted that the primary caretaker of Arthur Jr. was respondent, his father. Whereas a “godmother” has no legal rights with respect to a child, a parent possesses a fundamental constitutional right in the care, custody and control of his children. 
In re M.H.
, 196 Ill. 2d 356, 362-63 (2001). Thus, unlike a godmother, a father has the right to say “no” to the mother if she wishes to remove the child from his care.
(footnote: 1)
 In the cause at bar, there is nothing of record to show that DCFS or anyone else informed respondent about the DCFS investigation of Lorraine conducted by Angela Harris in 2000, which occurred prior to the events alleged in the amended petition. Thus, because there is no evidence that respondent had notice of the conditions in Lorraine’s home, it therefore cannot be assumed that he condoned or acquiesced in Lorraine’s treatment of her children. In sum, because of the significant factual differences between the cause at bar and 
B.C.
, we do not find that 
B.C.
 is of guidance in resolving the issue presented.

We find that the court’s opinion in 
In re Edricka C.
, 276 Ill. App. 3d 18 (1995), however, is instructive. There, the court held that the State failed to prove neglect as to the two minors involved, Edricka and Zemaj. The State had filed two petitions for adjudication of wardship. One petition alleged that Edricka was neglected because “the minor’s parent *** does not provide the proper or necessary *** medical or other remedial care recognized under state law.” The second petition alleged that Zemaj was abused “ ‘in that the minor’s parent *** creates a substantial risk of physical injury to such minor.’ ” 
In re Edricka C.
, 276 Ill. App. 3d at 20.

The petitions were based on a report that the mother failed to take Edricka for treatment for galactosemia, a blood disorder. Thus, DCFS considered Edricka medically neglected and Zemaj at substantial risk of physical injury. Subsequent medical testing showed that Edricka did not have the blood disorder alleged by DCFS in the petition. Nevertheless, the case proceeded to an adjudicatory hearing. The State introduced evidence that DCFS had previously come into contact with the family in connection with the children’s older siblings. A DCFS child welfare specialist testified that, six years earlier, the children’s oldest sibling had been severely beaten by their parents, and that five years earlier, the siblings had been left unsupervised in their apartment when a fire broke out in the building. The DCFS specialist also testified, however, that Edricka and Zemaj had lived with their mother without incident from their birth until the time the petitions for adjudication were filed. The circuit court, basing its ruling on a theory of anticipatory neglect, found that both Edricka and Zemaj were neglected because their environment was injurious and they were at substantial risk of serious injury.

The appellate court reversed. The court noted that the State had presented no evidence at trial that Edricka and Zemaj had witnessed abuse or neglect, or that the children were at any risk in their home prior to the filing of the petition. In addition, the appellate court noted that the petition concerning Edricka alleged medical neglect, and that the State pursued a neglect finding on a theory of anticipatory neglect. The court determined, however, that the evidence was uncontradicted that Edricka and Zemaj were perfectly healthy.

With respect to Edricka, the court held that “the record does not reveal that, by a preponderance of the evidence, Edricka lacks care, is exposed to an injurious environment, and is at substantial risk of physical injury.” 
In re Edricka C.
, 276 Ill. App. 3d at 30. With respect to Zemaj, the court observed that the petition alleged that he was abused because the mother placed him at “substantial risk for physical injury.” Zemaj’s petition derived from the petition concerning Edricka, based upon the theory that because his sister was medically neglected, Zemaj was at risk. The appellate court held that the circuit court erred in basing its findings with respect to Zemaj on speculation, and found that the trial court’s findings came “too close to a per se rule of anticipatory neglect.” 
In re Edricka C.
, 276 Ill. App. 3d at 31. Although the court recognized that, under the Act, evidence of past sibling abuse is admissible, the court found that such evidence, by itself, was insufficient to show that the children were subjected to a risk of harm. The court stressed that each case concerning the adjudication of minors must be reviewed according to its own facts, and that the record before it did not support the trial court’s determination.

Similarly, in the matter at bar, the State failed to meet its burden of proof to establish that Arthur Jr. is a neglected minor who is at probable and substantial risk of suffering harm. As in 
Edricka C.
, the State adduced no evidence at the adjudicatory hearing in the cause at bar that Arthur Jr. had ever witnessed any abuse or neglect. It is uncontradicted that Arthur Jr. was not present during the five occasions which form the basis of allegations in the amended petition. Also, as in 
Edricka C.
, there was no testimony adduced by the State in the matter at bar that Arthur Jr. was at a risk of harm. Indeed, we find it notable that the State did not initially institute the adjudicatory petition with respect to Arthur Jr.; rather, it was the court that 
sua sponte
 ordered the State to file the petition as to Arthur Jr. simply on the basis that he is a child of Lorraine. From the very first court hearing in this case, the record reveals that it was clear that all parties were aware that Arthur Jr. was not present in Lorraine’s home during February and March 2001, and that he was residing with respondent in Milwaukee. In addition, the DCFS service plan prepared on April 24, 2001, contained virtually no mention of Arthur Jr. did not list him as being a member of Lorraine’s household, and directed no tasks or services for him. In essence, the status of Arthur Jr. had not been a concern for DCFS or the State.

We further observe that, with respect to the specific allegations in the amended petition, count I alleged that Arthur Jr. was neglected on the basis of the medical neglect of his sibling. At trial, as in 
Edricka C.
, the State pursued a finding of neglect with respect to this child on the theory of anticipatory neglect. However, also as in 
Edricka C.
, the State introduced no testimony that Arthur Jr. was in ill health, that he had missed his immunizations, that he had developmental delays, or that he had not been taken to a doctor. Thus, as in 
Edricka C.
, the evidence of record did not establish, by a preponderance of the evidence, that Arthur Jr. lacked care, was exposed to an injurious environment, or that he was at a probable and substantial risk of harm.

Similarly, with respect to the allegations contained in count II of the amended petition, we hold that the State failed to satisfy its burden of proof to establish that Arthur Jr. was a neglected minor on the basis that Lorraine had left his siblings unsupervised. Once again, the State failed to present evidence at adjudication that Arthur Jr. had ever been left unsupervised, and that he was at a probable and substantial risk of future harm of being left unsupervised. We find that a finding of neglect on this basis would be speculative and not supported by the record.

In sum, we hold that, on this specific record, the circuit court’s finding that Arthur Jr. was a neglected minor was against the manifest weight of the evidence. As stated, the term “neglect” is “ ‘not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of the surrounding circumstances changes.’ ” 
In re N.B.
, 191 Ill. 2d at 346, quoting 
Labrenz
, 411 Ill. at 624. Similarly, “injurious environment” is an amorphous concept that cannot be defined with particularity. 
In re N.B.
, 191 Ill. 2d at 346. Neglect and injurious environment rulings are driven by their facts (
In re N.B.
, 191 Ill. 2d at 347), and, in the instant cause, the facts lead us to conclude that the trial court erred in finding Arthur Jr. to be neglected.

Our decision today should not be construed as a criticism of the theory of anticipatory neglect. To the contrary, we agree that, when faced with evidence of prior neglect by parents, “the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.” 
In re Brooks
, 63 Ill. App. 3d 328, 339 (1978). However, we emphasize that the State must be held to its burden of proof. These cases involve relationships touching upon fundamental rights, and the natural ties between parents and their children may not be severed on the basis of mere speculation. Yet, in the cause before us, this is precisely what happened. In light of the specific facts presented which establish that Arthur Jr. was not at a probable and substantial risk of harm, we are deeply troubled by the actions of the circuit court judge in directing the State to file a petition for adjudication of wardship with respect to Arthur Jr. and entering a juvenile custody warrant resulting in a four-year-old child being forcibly removed from his Wisconsin home and placed in Illinois foster care. We note that, as a result of the precipitous actions of the circuit court, Arthur Jr. has spent more than three years in a foster home.

We stress that although section 2–18(3) of the Act (705 ILCS 405/2–18(3) (West 2000)) provides that the proof of neglect of one minor “shall be admissible evidence” on the issue of the neglect of any other minor for whom the parent is responsible, the mere admissibility of such evidence does not constitute conclusive proof of the neglect of another minor. Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipatory neglect based upon the neglect of a child’s sibling, must be reviewed according to its own facts.

Accordingly, because we hold that the State failed to prove the allegations of neglect with respect to Arthur Jr. the amended petition for adjudication of wardship must be dismissed. 705 ILCS 405/2–21(1) (West 2000); 
In re N.B.
, 191 Ill. 2d at 343. The appellate court erred in remanding this cause to the circuit court for a dispositional hearing.

Because of our disposition of this matter, we need not address the remainder of the parties’ arguments on appeal.

CONCLUSION

For the foregoing reasons, the judgment of the appellate court reversing the finding of neglect with respect to Arthur Jr. is affirmed. The appellate court’s judgment remanding this cause to the circuit court is reversed. Because we hold that the State failed to prove the allegations of neglect with respect to Arthur Jr. the judgment of the circuit court is reversed and the amended petition for adjudication of wardship is dismissed.

Appellate court judgment

affirmed in part and reversed in part;

circuit court judgment reversed.

JUSTICE GARMAN, dissenting:

Both the appellate court and the majority would reverse the circuit court’s finding of neglect. Because I conclude that the finding that Arthur H., Jr., was neglected within the meaning of section 2–3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2–3(1)(b) (West 2000)) was not against the manifest weight of the evidence, I respectfully dissent.

At the temporary shelter care hearing with respect to Earl H. and three of his siblings, the circuit court learned that Lorraine had a fifth child, Arthur Jr., who was believed to be staying with his father in Milwaukee because his mother lacked transportation that would have enabled her to “ ‘get him back.’ ” Slip op. at 2. The State indicated a desire to locate Arthur Jr. and to restrict Lorraine’s contact with him. Slip op. at 3. The suggestion was made by the DCFS investigator that the child’s father might be seeking custody in a Wisconsin court (slip op. at 2-3), but there was no evidence that such a proceeding had been initiated or that Lorraine’s custodial rights were in any way diminished. Indeed, because it was not known how long this arrangement had been in effect, it was not altogether clear whether a Wisconsin court would have had jurisdiction to determine custody of the child. See 750 ILCS 35/1 
et seq. 
(West 2000) (Uniform Child Custody Jurisdiction Act–subsequently repealed, effective January 1, 2004, and replaced by the Uniform Child-Custody Jurisdiction and Enforcement Act, 750 ILCS 36/101 
et seq.
 (West Supp. 2003)); see also Wis. Stat. Ann. §822.01 
et seq. 
(West Supp. 2000).

Regardless of the wording of the juvenile custody warrant or the means used to locate Arthur Jr. and to obtain jurisdiction over him, the circuit court was well within its discretion to direct the State to locate the child and to file a neglect petition. It was entirely possible, given Lorraine’s statement that she did not know where the child was or how to contact him, that Arthur Jr. was in an entirely unsuitable environment or was a victim of abuse.

Thus, it is not disputed that Arthur Jr. was properly the subject of an adjudicatory hearing pursuant to section 2–21(1) of the Act (705 ILCS 405/2–21(1) (West 2000)). I also agree with the majority that the appropriate focus of the neglect inquiry at such a hearing is the status of the child, not the conduct of either parent. Slip op. at 18-20. However, the majority then improperly shifts its focus away from the circumstances of the child and onto the individual parents. The majority does what it has identified as error on the part of the appellate court–it concludes that Arthur Jr. should not have been adjudicated neglected because the only evidence of neglectful conduct pertained to his mother. In effect, the majority concludes that Arthur Jr. was not neglected because Arthur Sr. did not neglect him.

It is at this point in the analysis that, for several reasons, I part company with the majority. First, focusing on the child, we know that he is the nonmarital child of Lorraine. We know that Lorraine and Arthur Sr. agree that he is the child’s biological father. We are told that Arthur Sr. signed an acknowledgment of paternity in Wisconsin, but the circumstances surrounding the execution of that document are unknown. We do not know if Lorraine signed it, so the legal effect, if any, of that document is not established. See, 
e.g.
, 750 ILCS 45/5(a)(3), (a)(4) (West 2000) (requiring that an acknowledgment of paternity by a man purporting to be the father of a child be signed by both the man and the child’s mother in order to create a presumption of paternity); see also Wis. Stat. Ann. §891.405 (West 1994) (creating a presumption of paternity if both the mother and the man claiming paternity have complied with the statute governing acknowledgment of paternity and no other man is presumed to be the father). Thus, no presumption of paternity has arisen and, legally, the relationship between Arthur Sr. and Arthur Jr. is that of putative father and nonmarital child.

By the date of the adjudicatory hearing, there had been no adjudication of paternity, no award of custody, no support obligation established, and no fixing of visitation rights with regard to Arthur Jr. As a result, custody of this nonmarital child was presumed to be with his mother. See, 
e.g.
, 720 ILCS 5/10–5(a)(3) (West 2000) (for purposes of statute on child abduction, it is “presumed that, when the parties have never been married to each other, the mother has legal custody of the child unless a valid court order states otherwise”); see also 750 ILCS 45/14(a)(2) (West 2000) (even where there has been a judgment of paternity, in the absence of an order granting custody to the father or unless he has had physical custody for at least six months prior to the date that the mother seeks to enforce her custodial rights, custody shall be presumed to be with the mother). 
Arthur Sr. had mere physical custody of the child, not legal custody, and the duration of his physical custody was a matter of dispute. Lorraine could have insisted on the child’s return at any time. Indeed, Arthur Sr. admitted that he would have returned the child to Lorraine if she had asked. In sum, Arthur Jr., had one legal parent, one putative parent, and four siblings or half-siblings who were neglected while residing with the mother they shared.

The State’s theory with regard to the alleged neglect of Arthur Jr. is sometimes referred to as “anticipatory neglect.” This court has not used the term before, but there is ample case law from the appellate court utilizing and defining the term. See,
 e.g.
, 
In re S.R.
, 349 Ill. App. 3d 1017 (2004); 
In re J.P.
, 331 Ill. App. 3d 220 (2002); 
In re Edricka C.
, 276 Ill. App. 3d 18, 28 (1995). The theory arises from section 2–18(3) of the Act, which states that proof of the abuse or neglect of one minor “shall be admissible evidence on the issue of the abuse [or] neglect *** of any other minor for whom the respondent is responsible.” 705 ILCS 405/2–18(3) (West 2000). Thus, if Lorraine was “responsible” for Arthur Jr., her neglect of her other four children may be used as evidence that she is likely to neglect him in the future. As the sole adult with custodial rights to Arthur Jr., she was surely responsible for him even though she voluntarily relinquished her responsibility, for a time, to Arthur Sr.

My second point of disagreement with the majority is its resolution of the question of whether Lorraine was likely to neglect Arthur Jr. in the future. The majority overlooks the significant similarity between Arthur Sr. and the godmother in 
In re B.C.
, 262 Ill. App. 3d 906 (1994), to whom the respondent mother had temporarily relinquished physical custody of B.C. Slip op. at 24. Neither Arthur Sr. nor the godmother had any custodial rights to the children. Both Lorraine and B.C.’s mother could have removed their children at any time. The majority opines that “unlike a godmother, a father has the right to say ‘no’ to the mother if she wishes to remove the child from his care.” Slip op. at 24. The only authority offered for this blanket statement of paternal veto power over the rights of a custodial mother is the fundamental constitutional right of a parent to the care, custody, and control of his children. However, while a father’s interest in maintaining a relationship with his child is a fundamental liberty interest, his rights arise from the state and federal constitutions and are implicated only if the 
state
 attempts to interfere with them, not if the mother of his nonmarital child seeks to enforce her custodial rights. 
In re Adoption of K.L.P.
, 198 Ill. 2d 448, 466-67 (2002).

Arthur Sr. certainly had standing to seek an adjudication of paternity and custody of his son. At the time of the adjudicatory hearing, however, he had not done so. His own testimony reveals that if Lorraine had demanded the child’s return, he intended to abide by their informal agreement and to return the child to her. I therefore conclude that this case is quite similar to 
B.C.
 and that the same result should apply–the child’s temporary residence with someone other than his custodial parent should not preclude a finding of neglect under a theory of anticipatory neglect.

The case law is clear that when the State seeks an adjudication of neglect of one child based on evidence of neglect of the child’s siblings, the court should fully consider the child’s current care and condition. See 
Edricka C.
, 276 Ill. App. 3d at 28. In the present case, Arthur Jr. was apparently well cared for in Milwaukee before these proceedings began, just as B.C. was apparently well cared for by her godmother. His condition, however, was that he was a nonmarital child in the physical, but not legal, custody of a man who was his biological, but not legal, father
. 
His siblings and half-siblings were being neglected by his only legal parent and he was at risk of the same neglect if his mother demanded his return.

The majority focuses on the fact that Lorraine lacked transportation and was therefore unlikely to be able to travel 100 miles “across state lines” to Milwaukee to retrieve him. Slip op. at 24. I cannot imagine that it would have been difficult for Lorraine to prevail upon a friend or relative to give her a ride to Milwaukee for something as important as picking up her son. I can, however, imagine the scene if, as the majority would have it, the petition had been dismissed and she had gone to Wisconsin to demand the child’s return. Arthur Sr. would either have given up the child, which all agree would have exposed him to neglect, or else he might have refused. The police might have been called. They would have learned that Lorraine and Arthur Sr. had never been married and that Arthur Sr. did not have a court order giving him custody of the child. They would also have learned that a neglect petition had been dismissed in Illinois and that, as a result, Lorraine’s custodial rights were still in full effect. It is likely that the child would have been sent back to Illinois with his mother.

My third concern is that the majority uses imprecise language and undefined terms in a manner that will cause confusion as our circuit and appellate courts attempt to discern the precedential effect of this case. For example, the majority states that the “uncontradicted evidence” shows that Arthur Sr.’s home was the child’s “primary residence.” Slip op. at 23. The evidence, however, was in dispute. Lorraine and Arthur Sr. gave differing accounts of the amount of time the child spent with each parent. Because Arthur Sr. opposed the finding of neglect, he and his mother, who supported his version of events, may have been inclined to exaggerate the amount of time the child was in Milwaukee. Lorraine may have minimized the amount of time the child spent at his father’s, although her motive to do so is not clear since she obviously was not going to be able to have Arthur Jr. returned to her, no matter whom the court believed. This is not uncontradicted evidence of a child’s primary residence. In the end, the circuit court was not convinced that either parent was presenting an unbiased view. See 
In re D.F.
, 201 Ill. 2d 476, 498-99 (2002) (under a manifest weight of the evidence standard, a reviewing court gives deference to the trial court as the finder of fact because it is in a better position to observe the conduct and demeanor of parties and witnesses and to assess their credibility). The court reasonably concluded that the actual amount of time the child spent with his father was somewhat more than Lorraine described and somewhat less than Arthur Sr. described.

Even leaving aside the fact that the evidence was in dispute, the term “primary residence” is not found anywhere in the Act or in the case law applying the Act. Indeed, if primary residence were a determinative factor in neglect cases, any parent could avoid a neglect finding by placing his or her child in the home of a grandparent or other caregiver long enough for that home to become the child’s “primary residence.”

Similarly, the majority makes much of the “legal relationship” between Arthur Jr. and Arthur Sr. and the fact that Arthur Sr. was the “primary caretaker” of his son. Slip op. at 24. As I noted above, the legal relationship between Arthur Sr. and Arthur Jr. is not established. The relationship appears to be that of putative father and nonmarital child. If and when Arthur Sr. successfully asserts his parental rights in a parentage action or effectively acknowledges his paternity (see 
People ex rel. Department of Public Aid v. Smith
, No. 97120 (September 23, 2004)), he will be the child’s legal father. Until then, there is no legal relationship between two, just as there is no legal relationship between Arthur Sr. and Lorraine’s daughter, Jaquane, whom the parties believe is his daughter. In any event, even if the acknowledgment of paternity signed by Arthur Sr. in Wisconsin was effective to create a parent-child relationship, it was not effective to confer to legal custody upon Arthur Sr.

“Primary caretaker” is a description often used in the context of child custody disputes between divorcing parents to argue for the award of custody to the parent who has provided a greater share of the day-to-day parenting of the child. See, 
e.g.
,
 In re Marriage of Wycoff
, 266 Ill. App. 3d 408 (1994). If, after an adjudication or effective acknowledgment of paternity, a dispute were to arise between Arthur Sr. and Lorraine over the custody of their son, his status as primary caretaker, if proven, would weigh heavily in his favor. In an adjudicatory proceeding under the Act, however, saying that a putative father has been the primary caretaker of a child is just another way of saying what the majority has criticized the appellate court for saying–that Arthur Jr. was not neglected because only one of his parents was neglectful.

Finally, the majority acknowledges that the standard of review in this case is whether the circuit court’s finding of neglect was against the manifest weight of the evidence, but then engages in its own assessment of the credibility of the witnesses and its own weighing of the evidence. In effect, the majority engages in 
de novo 
review and concludes that it would have reached a different decision on the question of whether Arthur Jr. was neglected. This is something we are not permitted to do, even if the case is a hard one and even if the respondent parent is a very sympathetic character. A reviewing court must not reverse a circuit court’s determination on the question of neglect unless the finding is “against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result.” 
In re N.B.
, 191 Ill. 2d 338, 346 (2000).

In the present case, the circuit court certainly could have concluded that Arthur Jr. was not neglected as alleged in any of the three counts in the petition. However, given Arthur Jr.’s status as a nonmarital child whose mother had full custodial rights to him, the substantial risk that she would successfully assert those rights, and the evidence of neglect of his siblings, I conclude that the circuit court’s findings were not against the manifest weight of the evidence.

In 
In re S.S.
, 313 Ill. App. 3d 121 (2000), the State sought an adjudication of neglect of a child born 20 months after the death of his infant sister. The theory was anticipatory neglect. After the older child died of shaken baby syndrome, the father was charged with first degree murder and involuntary manslaughter. He was acquitted. The parents of the child had never been married and they were no longer together at the time of the adjudicatory hearing. The circuit court found the child neglected and made him a ward of the court. Both parents appealed. Like the appellate court in the present case, the appellate court in 
S.S.
 considered the parents separately and concluded that the evidence was sufficient to establish the father’s neglect, but not the mother’s.

As a result of the majority opinion in the present case, we now know that the proper inquiry at the adjudicatory hearing is whether the child is abused or neglected, not which parent is responsible for the abuse or neglect. Although the appellate court in 
S.S.
 engaged in unnecessary consideration of the degree of responsibility of each parent at the adjudicatory stage, it did reach the correct result: “Because the evidence of past sibling abuse by [the father] was sufficient to establish a finding of neglect, the trial court properly determined that it was in the best interest of S.S. that he be made a ward of the court.” 
S.S.
, 313 Ill. App. 3d at 132. The court then went on to determine that it was error for the circuit court at the dispositional stage to remove custody of S.S. from his mother, in whose custody he would not have been at risk, and to place guardianship with DCFS.

In my opinion, this would have been the proper procedure in the present case. Arthur Jr. was properly found to be neglected based on the fact that siblings were neglected in the home of his mother, whose custodial rights to him were not limited in any way. If the evidence at the dispositional stage revealed that he had an “otherwise fit parent” who was ready, willing, and able to assume custody, the circuit court should have “exercise[d] extreme prudence before placing [him] under the guardianship of DCFS.” 
S.S.
 , 313 Ill. App. 3d at 132-33. At this point, the circuit court might well have determined that the best interests of Arthur Jr. would have been served by placing him with his father. 705 ILCS 405/2–23(1) (West 2000). Lorraine might have been granted supervised visitation, or a protective order requiring her to stay away from Arthur Jr. might have been warranted. 705 ILCS 405/2–25(1)(a), (1)(b) (West 2000).

The majority’s resolution, reversing the finding of neglect and dismissing the State’s petition, returns father and son to the 
status quo ante
. There is still no finding of paternity and no award of custody. Arthur Sr. will have physical possession of his son, but not legal custody.

If Lorraine’s parental rights to Arthur Jr. have already been terminated, a question not answered in the briefs, Arthur Jr. may be left without a legal parent. On the other hand, if her rights have not been terminated, the majority has undermined the ability of the State to seek to terminate her parental rights because if a child is not abused, neglected, or dependent then he cannot be the subject of a petition to terminate parental rights. 705 ILCS 405/2–12(2) (West 2000) (a petition in respect of a minor under the Act “shall allege that the minor is abused, neglected, or dependent, with citations to the appropriate provisions of this Act, and set forth *** facts sufficient to bring the minor under Section 2–3 or 2–4” of the Act). See also 
In re J.P.S.
, 198 Ill. App. 3d 633 (1990) (holding that the State’s petition to terminate parental rights did not state a cause of action because the child had not been adjudicated an neglected or dependent minor as required by the Act).

It is my sincere hope that Arthur Sr. will act promptly to clarify the status of his son and that their family will quickly overcome the effects of this long separation.

JUSTICE THOMAS joins in this dissent.

FOOTNOTES
1:     
1
We note that the dissenting justices repeatedly characterize Arthur Sr. as the “putative” father of Arthur Jr. “Putative” is defined as “[r]eputed; believed; supposed.” Black’s Law Dictionary 1250 (7th ed. 1999). However, there is no dispute in the record that Arthur Jr. is the biological child of Arthur Sr. Notably, the dissenting justices acknowledge this fact early in their separate opinion when they state that “[w]e know that Lorraine and Arthur Sr. agree that he is the child’s biological father,” and observe that “Arthur Sr. signed an acknowledgment of paternity in Wisconsin.”