**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200266-U

Order filed May 12, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* Z.M., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor, | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-20-0266, 3-20-0267, |
| Petitioner-Appellee, | ) | and 3-20-0268 (Consolidated) |
| | ) | Circuit Nos. 19-JA-298, 19-JA-299, |
| v. | ) | and 19-JA-300 (Consolidated) |
| | ) | |
| Kayla S., | ) | Honorable |
| | ) | David A. Brown, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justices Holdridge and Lytton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's neglect and fitness findings were not against the manifest weight of the evidence.

¶ 2    Mother, Kayla S., appeals from orders of the circuit court finding minors Z.M., G.L., and S.L. neglected and mother unfit. On appeal, mother argues the circuit court's findings were against the manifest weight of the evidence. We affirm.

I. BACKGROUND

¶ 4    On September 4, 2019, the State filed three separate petitions for adjudication of wardship (neglect petitions) alleging that siblings Z.M. (D.O.B. 7/14/2019), G.L. (D.O.B. 1/31/2015), and S.L. (D.O.B. 10/03/2013) were neglected due to an environment injurious to their welfare pursuant to section 2-3 of the Juvenile Court Act of 1987 (the Act). 705 ILCS 405/2-3 *et seq*. (West 2018). The matters were heard together in the circuit court and remain consolidated for purposes of this appeal. All three lengthy neglect petitions contain nearly identical allegations. The contents of the neglect petitions are summarized below for the convenience of the reader.

¶ 5    The petitions alleged that prior to Z.M.'s birth, both of Z.M.'s parents, mother and James M., mother's current paramour, were the subject of separately indicated reports, investigated by the Illinois Department of Children and Family Services (DCFS), pertaining to children at a substantial risk of physical injury due to an injurious environment.[1] The petitions also alleged James M. was previously found to be an unfit parent, and remained an unfit parent, in Peoria County case No. 18-JA-338, due to a pattern of domestic violence which included a "severe incident" of domestic violence. The State alleged both mother and James M. also had mental health issues.

¶ 6    The petitions further alleged that due to a medical condition present on the day of Z.M.'s birth, July 14, 2019, hospital personnel recommended continued treatment and hospitalization for Z.M. until July 25, 2019. Frustrated that Z.M. had not been discharged, James M. became belligerent with hospital staff. During the confrontation with hospital staff, James M. threatened to remove Z.M. from hospital care against medical advice.

---

[1]The petitions alleged mother was indicated on March 3, 2015, and James M. was indicated on June 20, 2016, and July 25, 2017.

¶ 7        After James M.'s confrontation with the hospital staff, DCFS became involved and notified mother that James M. had been adjudicated as an unfit parent in a separate case. DCFS advised mother that she should not allow her children to have unsupervised contact with James M. Despite these admonishments, mother continued to allow unsupervised contact between James M. and her children. Upon investigation, S.L. reported to the agency that mother and Z.M. stay with James M. Both S.L. and G.L. reported that they are afraid of James M. because he is mean to them and mean to their mother. As a result of the continued contact between James M. and the children, DCFS implemented a safety plan wherein mother and the children would reside with a relative, rather than with James M., and where mother's contact with the children would be supervised.

¶ 8        However, the petitions alleged mother failed to comply with the safety plan. The agency stressed to mother the importance of caring for her children, but mother refused to reside in the relative's home and left the children in the care of that relative for approximately one month. Specifically, the petition alleged mother did not stay in the relative's home between August 26, 2019, and September 3, 2019, and had no contact with the children between August 3, 2019, and September 4, 2019. Mother refused to provide DCFS with her current address during this time.

¶ 9        On October 2, 2019, mother answered the State's neglect petitions and admitted she was previously indicated by DCFS in March 2015 despite the case being "overturned on appeal." Mother also admitted in her answer that she had a history of mental health issues, was made aware that James M. was previously found unfit and had not successfully completed court ordered services, did not reside in the relative's home between August 26, 2019, and September 2, 2019, and left the children in the relative's care during her absence. Mother additionally admitted that James M. stated that mother stays with James M. at least two nights

3

per week. Mother either denied and/or plead insufficient knowledge to admit or deny the remainder of the allegations. James M. stipulated to the contents of the State's neglect petition pertaining to his child, Z.M.

¶ 10        The circuit court conducted an adjudicatory hearing on December 18, 2019.[2] DCFS investigator, Heidi Creasy, provided lengthy testimony, which is summarized below. Creasy met with mother on July 24, 2019, at St. Francis Hospital. According to mother, prior to July 24, 2019, mother was unaware of James M.'s criminal history and his involvement with DCFS. However, mother told Creasy that mother "Googled" James M. and discovered James M. had been accused of violent and/or aggressive crimes in the past, including violence against an ex-girlfriend.

¶ 11        During this meeting with mother, Creasy advised mother James M. should not be permitted to have contact with Z.M. or her other children. Mother informed Creasy that mother was not living with James M. and claimed she would never speak with James M. again.

¶ 12        On July 25, 2019, Creasy spoke with James M. at a local McDonald's restaurant. During this conversation, James M. told Creasy that he did not disclose anything about his previous DCFS involvement or his pending criminal charges to mother. According to James M., mother and her two children, S.L. and G.L., had been living with James M. in his home prior to Z.M.'s birth, but were now temporarily living at "Grandma's" and were no longer living in his residence.

¶ 13        Creasy spoke with mother again on August 1, 2019. On that date, mother stated that neither she nor the children had any contact with James M. since her last conversation with

_____

[2]The State admitted State's exhibit No. 1A and 1B, certified copies of Peoria County case No. 18-JA-338, over mother's objection, State's exhibit No. 2, Z.M.'s hospital records, and State's exhibit Nos. 3 and 4, records concerning both mother and James M.'s prior DCFS indications.

Creasy on July 24, 2019. Creasy told mother to be truthful with Creasy about her living situation or Creasy was going to remove the children from mother's care due to safety concerns. Mother initially denied contact with James M. but later admitted to Creasy that mother and Z.M. spent one night together with James M. in his home. Mother told Creasy that she did not stay at grandmother's house with the children on some nights. On those occasions, mother purported to be staying with other family members.

¶ 14       Creasy also spoke with six-year-old S.L. on August 1, 2019. S.L. stated that the family lived together with James M. and described James M. as "very mean." S.L. further stated that mother sometimes stays with her at grandmother's home, but sometimes stays at James M.'s, but she's not supposed to say that." S.L. further reported that mother told S.L. to say that mother was always staying at grandmother's house, but this was untrue. Mother admitted that she told S.L. to lie about their living situation.

¶ 15       Similarly, four-year-old G.L. stated that mother sometimes stays at grandmother's home and sometimes stays at James M.'s home with Z.M. G.L. denied violence within the family but described James M. as "mean." G.L. stated that G.L. is sometimes afraid of James M. and that his mother cried a lot.

¶ 16       Based on these conversations, Creasy initiated a safety plan for the children that allowed mother to have only supervised contact with the children. The safety plan required the children to reside at grandmother's home.[3] During an August 12, 2019, conversation with Creasy, mother said she had not seen the children since the previous Friday. Mother sometimes spent nights with the children at grandmother's home and otherwise stayed with other family members. Mother refused to provide addresses so that Creasy could verify mother's statements. Creasy repeatedly

_____

[3]The safety plan was not admitted into evidence.

encouraged mother to spend more time with the children, including routine overnight stays with newborn, Z.M.

¶ 17     One week later, on August 19, 2019, mother told Creasy she was no longer living with grandmother and her children. When asked why mother was not spending the night with Z.M. at grandmother's residence and was instead choosing to leave the children's care in grandmother's hands, mother became angry, and a heated exchange ensued with the children present. According to Creasy, mother started screaming and yelling that "DCFS wasn't going to disappear, that she was staying with her adoptive mother, brother, and sister-in-law." After the exchange, Creasy observed the children appeared to be frightened and were huddled together in the corner of the grandmother's living room.

¶ 18     During a subsequent conversation with Creasy that took place on August 26, 2019, mother stated DCFS would not "disappear" even if mother stayed at grandmother's home as suggested. Mother reported she last visited with the children over the weekend. Creasy once again emphasized the importance of mother bonding with Z.M. However, mother stated she was not spending time with the children because her contact with the children was supervised, and mother could not take the children to other places.

¶ 19     Creasy placed the children in protective custody on September 3, 2019, because mother had not spent the night with the children for an extended period. Moreover, Creasy remained unaware of mother's current living situation because mother refused to provide the caseworker with mother's current address.

¶ 20     Mother also gave sworn testimony during the hearing before the court. According to mother, she had no knowledge of James M.'s prior DCFS involvement before July 24, 2019. Mother was only aware that James M. had visitation with his son. Mother testified that James M.

was her current boyfriend and Z.M.'s father. Mother explained that she and the children lived with James M. for about a month in June 2019, before she was told her children could not be around James M. After July 24, 2019, mother did not permit James M. to have contact with her children, including Z.M., and told Creasy that mother would end her relationship with James M.

¶ 21 When testifying, mother denied James M. was belligerent toward hospital staff and denied instructing her children to lie to Creasy about their living arrangements. As of August 1, 2019, mother claimed to have lived with her children at her grandmother's home. Mother explained that her grandmother had become hostile toward her and they argued about James M. and the "situation with DCFS." Mother believed it was unhealthy for her to stay at the grandmother's home because she did not want her children hearing the frequent arguments. During this time, mother testified that the children's needs for food, clothing, and schooling were being fulfilled.

¶ 22 Mother testified that while she was not visiting the children at grandmother's home, oftentimes she visited with the children when they were present daily at another grandmother's home during August 2019. Mother believed she was bonding with Z.M. during this time as she fed, clothed, and interacted with Z.M. Mother testified that she was hospitalized for postpartum depression following S.L.'s birth. Mother saw therapists and psychiatrists from 2014 to 2016 and was on antidepressants for a period. Mother's therapy was eventually discontinued.

¶ 23 During cross-examination by the minors' guardian *ad litem*, mother explained that she fought with her grandmother about how mother raised her children, including what they ate and drank. On cross-examination by the State, mother testified she was unaware of whether James M.'s visits with his son were supervised and thought his visitation situation was due to a parental custody agreement. Mother testified that she reached a turning point when she learned James M.

7

had domestic violence charges pending and learned those charges involved the mother of James M.'s son. After receiving this information, mother decided to bar James M. from having contact with the children. However, mother noted that James M. was never physically violent with her or the children. Mother did not believe James M. committed the pending criminal offense/offenses.

¶ 24    Lastly, mother testified that she would pump breast milk and leave it with her grandmother for Z.M. However, according to mother's testimony, her grandmother did not want to use the milk because it caused Z.M. to have stomachaches.

¶ 25    Following argument, the circuit court found the State failed to prove that Z.M. was staying at James M.'s residence. The court also found the State failed to prove mother and the children had not been together between August 3, 2019, and September 3, 2019. The court found mother's testimony about the nature of the hospital altercation and the environment in her grandmother's home was not credible. The court further noted that mother continues her relationship with James M. and minimizes or disagrees with the notion that James M. is an unfit parent. Lastly, the court noted it was hard to believe "much of what Mom had to say." For these reasons, the court found the children neglected in that their environment was injurious to their welfare.

¶ 26    Regarding the subsequent dispositional proceedings, the dispositional hearing report (report) filed on June 10, 2020, documented that mother currently resided with James M. and was employed full time as a store manager at a local Hy-Vee gas station. Due to Covid-19, a home and safety check of mother's home did not take place.

¶ 27    The report detailed mother's cooperation regarding her integrated assessment and her completion of several tasks, including a parenting class. The report documented that mother was currently participating in individual psychotherapy sessions, however, counseling goals to assist

8

mother overcome her mental health symptoms remained pending. Mother's drug drops were negative, and mother had not missed a supervised visit, where she brings gifts and games for the children. However, due to Covid-19, in-person visits were suspended, and mother video chats with the children each week. The report documented that all three children were placed in the home of a "licensed" relative, where they were happy and healthy and their needs were being met. In conclusion, the report recommended that all three children be made wards of the court and requested that DCFS be appointed guardian.

¶ 28    On June 17, 2020, the circuit court conducted a dispositional hearing. First, the court noted its receipt of the report. Next, the State apprised the court that James M. had recently plead guilty to a class 4 domestic battery in case No. 18-CF-508 and was currently serving a term of probation.

¶ 29    After brief testimony from a caseworker, counsel for mother requested the court to consider mother's fitness based on mother's history of negative drug drops, completion of a parenting class, and attendance at counseling. However, the court found mother unfit based on the contents of the petitions and made the children wards of the court. Mother appeals.

¶ 30                                II. ANALYSIS

¶ 31    On appeal, mother asks this court to reverse the circuit court's neglect and fitness findings, arguing both findings were against the manifest weight of the evidence. Conversely, the State urges this court to affirm that the circuit court's findings were fully supported by the evidence.

¶ 32                    A. Neglect Finding: Injurious Environment

¶ 33    A proceeding for adjudication of wardship "represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." *In re Arthur H.*, 212 Ill. 2d 441,

9

463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). Here, the State alleged the minors were neglected due to an environment injurious to their welfare. 705 ILCS 405/2-3 *et seq*. (West 2018). Thus, the State was required to show by a preponderance of the evidence that the minors were neglected due to an environment injurious to their welfare at the adjudicatory hearing. *In re An.W.*, 2014 IL App (3d) 130526, ¶ 56. A preponderance of the evidence constitutes proof that the allegations are probably truer than not. *In re Arthur H.*, 212 Ill. 2d at 464. Although "neglect" has been defined as the willful and unintentional disregard of parental duties, the term has no fixed meaning under the Act and is unique to the facts and circumstances of each case. *In re J.B.*, 2013 IL App (3d) 120137, ¶ 13; *In re K.B.*, 2012 IL App (3d) 110655, ¶ 16. Likewise, an "injurious environment" cannot be precisely defined but may include the breach of a parent's duty to ensure a safe and nurturing environment for his or her children. *In re J.B.*, 2013 IL App (3d) 120137, ¶ 13. The circuit court's neglect finding will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d at 464. A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *Id*.

¶ 34      Throughout the proceedings, the State focused on mother and James M.'s prior DCFS involvement. Thus, the circuit court's neglect finding was premised, at least in part, upon the theory of anticipatory neglect, which flows from the concept of an injurious environment. See *id*. at 468. In such instances, the State seeks to protect children who have a probability of becoming the victims of neglect or abuse because the children reside, or may reside in the future, with an individual who has neglected or abused another child. *Id*.

¶ 35      The exhibits presented to the circuit court during the adjudicatory hearing strongly implied that mother and the minors were likely victims and/or witnesses of domestic violence.

However, the State did not present direct evidence that James M. was physically abusive toward mother or the minors. Instead, the State submitted evidence that James M. was previously found unfit in Peoria County case No. 18-JA-338 and had not retained fitness. In that juvenile proceeding, James M. stipulated to allegations that he punched the mother of his other child, C.M., dragged her to the basement, and tied her up with an extension cord in C.M.'s presence, among other things. It is further undisputed that James M. has multiple domestic violence convictions, including a felony conviction.

¶ 36 During the adjudicatory hearing, the circuit court specifically found that portions of mother's testimony minimized James M.'s belligerent behavior at the hospital and those portions of her testimony were not credible. The court found that sometime after James M.'s outburst at the hospital, mother became aware of James M.'s criminal history and current DCFS involvement. The court found that mother lied to the agency when she stated she would have no further contact with James M. after July 24, 2019. The court believes mother disagreed and/or minimized the notion that James M.'s status as an unfit parent, and as an offender pending felony charges, created any risk to her children. Lastly, the court noted it was hard to believe "much of what Mom had to say."

¶ 37 Based on this record, we agree with the circuit court that mother knowingly disobeyed provisions of the safety plan implemented by DCFS. Mother instead chose to continue her relationship with James M., despite his history. Consequently, mother clearly abandoned her duty to act as the primary caregiver for her children, including newborn Z.M.

¶ 38 We conclude the circuit court was in a superior position to judge the credibility of the witnesses who provided extensive testimony before the court. After evaluating this case on its own specific set of facts, including a careful review of the testimony and exhibits presented to

11

the circuit court, we conclude the circuit court's findings are well supported by the record. Therefore, we affirm the circuit court's neglect findings pertaining to all three children.

¶ 39                                              B. Fitness

¶ 40        Next, mother argues the circuit court's fitness finding was against the manifest weight of the evidence. In support of her position, mother points out that at the time of the dispositional hearing, mother was employed, cooperating with DCFS, attending visits, had completed a parenting class and some counseling, and had a long series of clean drug screens. The State argues mother remains unfit at this time based on mother's current living situation and the need for further counseling/domestic violence-related education.

¶ 41        Following an adjudication of neglect, the cause proceeds to a dispositional hearing where the circuit court determines whether the parent is fit to care for the minor and whether custody of the abused or neglect minor should be restored to the parent or whether the child should be made a ward of the court. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). At this stage, where the circuit court's finding of parental unfitness does not result in the termination of parental rights, the standard of proof is a preponderance of the evidence. *In re April C.*, 326 Ill. App. 3d 245, 257 (2001). On review, the circuit court's fitness finding will not be overturned unless it is against the manifest weight of the evidence. *In re K.E.-K.*, 2018 IL App (3d) 180026, ¶ 18.

¶ 42        In this case, we agree with mother's position that the evidence presented at the dispositional hearing revealed mother was making some progress. For example, the record documents mother completed a parenting class and was involved in ongoing therapy. In addition, it appears mother was employed and was not using illegal drugs. Mother appeared to be cooperating with DCFS and was regularly engaged in visitation with the children.

¶ 43     As a sidenote, it is apparent that mother's home has not been inspected for safety due to the pandemic. Similarly, due to the pandemic, mother has been unable to join a community support group for victims of domestic violence because group sessions were suspended and have not been rescheduled. We recognize mother's compliance with these requirements is not possible due to circumstances beyond her control.

¶ 44     Mother is making a concerted effort to provide an improved environment where her children will be able to thrive. However, despite this commendable progress, mother continues to reside with James M., even though he is currently serving a term of probation related to a recent felony domestic violence conviction. As noted by the circuit court, mother chose to continue her relationship with James M., which in part, supports the conclusion that mother has not resolved the issues that placed the children at significant risk of injury or harm from their environment.

¶ 45     Based on this evidence, at the time of the dispositional hearing, mother was unable to provide a safe environment for her children. The circuit court's finding of unfitness was not against the manifest weight of the evidence where these serious concerns remain unresolved. For the above stated reasons, we affirm the circuit court's neglect and fitness findings.

¶ 46                                        III. CONCLUSION

¶ 47     The judgment of the circuit court of Peoria County is affirmed.

¶ 48     Affirmed.

13