NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210384-U

NO. 4-21-0384

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 3, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 21JA4 |
| v. | ) | |
| Kyara S., | ) | Honorable |
| | ) | Ramona Sullivan, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding the trial court did not err in finding the minor child to be abused and neglected.

¶ 2    Respondent, Kyara S. (Mother), appeals the trial court's dispositional order finding her daughter, K.S., abused and neglected, making her a ward of the court, and placing her under the guardianship and custody of the Illinois Department of Children and Family Services (DCFS).

¶ 3    On appeal, Mother specifically challenges the trial court's dispositional order, arguing the court's decision K.S. was abused and neglected stands against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5    On January 7, 2021, the State filed a petition for adjudication of neglect with

respect to K.S.—a minor child born to Mother on October 29, 2019—alleging K.S. was abused and neglected in accordance with sections 2-3(1)(b) and 2-3(2)(i) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), 2-3(2)(i) (West 2020)). The State filed the petition after K.S. presented to the emergency room with a broken femur, subconjunctival hemorrhages in both eyes, and X-rays revealing old, healed fractures to K.S.'s ribs and clavicle. Mother provided inconsistent explanations for K.S.'s current injuries and no explanation for the old injuries. Following a shelter care hearing, pursuant to the stipulation of abuse and neglect by Mother, the trial court issued an order placing temporary custody and guardianship of K.S. with DCFS.

¶ 6                                   A. Adjudicatory Phase

¶ 7                                   1. *The State's Evidence*

¶ 8           The trial court held an adjudicatory hearing over the span of three days in spring 2020. The State's evidence consisted of medical records and testimony from several witnesses from DCFS, law enforcement, and Carle Foundation Hospital (Carle). Witnesses testified about Mother's inconsistent explanations for how K.S. sustained the injuries. Mother first said K.S. got her leg caught in the vertical rails of her crib, but when law enforcement searched the apartment and found no crib, Mother said K.S. fell from a Pack-n-Play. Mother still insisted K.S. got her leg stuck in a rail on the Pack-n-Play and then fell to the hardwood floor, even when investigators said the scenario was implausible given the Pack-n-Play's construction and mesh walls. Mother also changed her story about where she was when K.S. was injured. She initially said she was alone with K.S. in the bedroom when K.S. fell from the Pack-n-Play. But Mother then claimed she was not in the room when K.S. fell. Mother eventually admitted she was sleeping on the couch in the living room while K.S. was in the bedroom with Mother's

paramour, Genesis Rivers, when she awoke to K.S.'s cries and found her child injured.

¶ 9        Detective Kaitlin Fisher of the City of Champaign police department testified Mother told her K.S. was injured at approximately 2 a.m. on January 5 but did not take her to the emergency room until approximately 6 p.m. Mother explained she did not have a phone or a car. Additionally, Mother's injured knee did not allow her to transport K.S. on her own. Mother told Detective Fisher that once she got her phone back from her cousin, she called Carle's patient hotline, and someone told her to take K.S. to the emergency room. Mother stated she had to wait for her sister and grandmother to help her get K.S. to the hospital. Detective Fisher testified that when she confronted Mother with K.S.'s old, healed rib and clavicular fractures, Mother "seemed alarmed" and "was not aware of these injuries." Mother could not say how K.S. might have sustained the old injuries, except to speculate that maybe K.S. injured herself when she tried to walk and would fall down. Witnesses from DCFS testified similarly to Detective Fisher, each recounting Mother's inconsistent stories about how K.S. was injured and why Mother delayed taking K.S. to the emergency room.

¶ 10        Medical personnel from Carle also testified. Nurse Stella Kiefer stated K.S. presented to the hospital "in a lot of pain," noting, "[s]he was crying, extremely irritable and restless." Kiefer "noticed right away that [K.S.'s] right leg looked very deformed," with "a large bulge on the upper thigh." Kiefer testified that test results showed K.S. sustained "a right transverse femur fracture, along with bilateral hemorrhages in both eyes and periorbital edema, so swelling around the eyes as well." Like other witnesses, Kiefer testified Mother provided inconsistent explanations about how K.S. was injured. Kiefer stated she "did not feel that the story coincided with the injuries of the child," so she reported the incident to DCFS.

¶ 11        Dr. Brent Reifsteck, a pediatrician at Carle, testified as "an expert in the area of

child abuse neglect medicine." He confirmed both the emergency room physician who treated K.S. and DCFS consulted him on January 5 about K.S.'s injuries. Dr. Reifsteck testified he did not treat K.S. or physically examine her because she was transferred to Riley's Children's Hospital (Riley's) in Indianapolis, Indiana, but he did review K.S.'s medical records from Carle and Riley's. Dr. Reifsteck opined K.S.'s right femur fracture could not have resulted from a short fall from a Pack-n-Play. The injury was "most likely abusive in nature." Dr. Reifsteck further opined K.S.'s subconjunctival hemorrhages likely resulted from "a traumatic injury or an inflicted injury" because K.S.'s medical records provided no other explanation for these injuries. Likewise, Dr. Reifsteck opined K.S.'s old injuries (healed rib and clavicular fractures and a possible old brain hemorrhage) were "most likely to be inflicted or *** abusive injur[ies]." He explained K.S.'s injuries, both the new and old fractures and the subconjunctival hemorrhages, would likely be inflicted by squeezing, shaking, or throwing K.S.

¶ 12                                    2. *Mother's Evidence*

¶ 13          Mother testified as the lone witness for her case. She testified K.S. lived with her at the time of the injury on January 5, 2021. She stated her "ex-boyfriend, Genesis, kind of lived with me off and on, stayed with me." She testified she had a broken knee at the time of K.S.'s injury and was sleeping on the couch when she heard K.S. crying. She stated she did not immediately check on K.S. but, when she did, Genesis told her K.S. "had fell out the playpen." Mother testified she tried to soothe K.S. and treat her red eyes and ice her leg. As for the delay in taking K.S. to the hospital, Mother repeated what she told the other witnesses. She stated her cousin had her phone and she had to wait for her grandmother to drive her and K.S. to the emergency room. She admitted she never asked anyone to call 911. She testified she relied on advice from her grandmother and "the Carle nurse hotline."

¶ 14    Mother testified Genesis would sometimes watch K.S. when Mother was working. She stated she now suspected Genesis caused K.S.'s old and recent injuries. Mother testified she changed her story of what happened to K.S. and who was in the apartment because Genesis told her to. Genesis had an outstanding arrest warrant "and he didn't want to be in the situation." She explained, "I didn't want to put that Genesis was there because that's what he told me to do. And then I re-changed the story to try to make it make sense, but it didn't make sense, so then I told the truth." Mother testified she ended her relationship with Genesis over this incident and now has an order of protection against him.

¶ 15                        3. *The Trial Court's Ruling*

¶ 16    Following the conclusion of evidence on June 1, 2021, the trial court issued an adjudicatory order. The court found "the minor is abused [and] neglected as defined by 705 ILCS 405/2-3 in that the minor is in an environment that is injurious to [her] welfare *** as defined by 705 ILCS 405/2-3(1)(b)," (neglect) and "is physically abused as defined by 705 ILCS 405/2-3(2)(i)." After detailing all the evidence presented, the trial court concluded a preponderance of the evidence, namely "the medical findings, the expert opinion of Dr. Reifsteck, and the inconsistent statement of [Mother]," showed "the minor is abused and neglected." The court further found the abuse and neglect were "inflicted or allowed to be inflicted by a parent or parents, specifically [Mother]."

¶ 17                        B. Dispositional Phase

¶ 18    On June 29, 2021, the trial court held a dispositional hearing wherein the parties agreed to admit the dispositional report and accept its recommendations. The report recited the circumstances surrounding K.S.'s injuries and her removal from Mother's care. The report further detailed Mother's cooperation and compliance with DCFS services, namely random drug

screens, domestic violence classes, and parenting education. The report noted Mother was on the waiting lists for anger management and individual counseling services, and she expressed willingness to engage in those services when available. The dispositional report confirmed Mother maintained employment, though she did change jobs in order to have a conventional work schedule that allowed her to attend visitation with K.S. The report further detailed Mother ended her relationship with Genesis Rivers and displayed "an understanding of mistakes she made as a parent and she is committed to correcting the conditions that led to [this] case opening." The dispositional report set the goal for K.S. to return to home and made three recommendations relating to Mother: (1) K.S. remain in DCFS's custody, (2) Mother cooperate with all recommended services, and (3) Mother maintain agency-supervised visits.

¶ 19       The trial court reviewed the report and concluded "that it's in the best interest of [K.S.] and the public that [she] be made a ward of the court. She will be adjudged neglected and abused based on the evidence that was presented at the adjudicatory hearing." The trial court found "[M]other at this time is unfit for reasons other than financial circumstances alone to care for, protect, train, and discipline" K.S., and it served K.S.'s best interests to remain in the custody and guardianship of DCFS. The trial court admonished Mother on what services she needed to complete, though it suspended drug screens since "it does not appear to me that there's any reason to continue watching you for a substance abuse problem." Addressing Mother, the trial court told her: "This is largely, as I believe your attorney has discussed with you, a very positive report. It's clear that you're taking this seriously. You're not trying to avoid any of the things that are being asked of you. You're committed to getting this right." The court described Mother's decision to change jobs to have more time with K.S. as "an excellent choice" and reiterated, "You're making a number of excellent choices." With that, the trial court admonished

Mother of her appeal rights and set the matter for a permanency review.

¶ 20       This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22       Mother argues the trial court's dispositional order erroneously found K.S. abused and neglected. We disagree and affirm the trial court's judgment.

¶ 23       The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) governs petitions for adjudication of wardship and outlines a "two-step process a trial court must employ in deciding whether a minor should be made a ward of the court." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068, 918 N.E.2d 284, 288 (2009). Step one requires the court to hold an adjudicatory hearing, where " 'the court shall first consider only the question [of] whether the minor is abused, neglected[,] or dependent.' " *Jay. H.*, 395 Ill. App. 3d at 1068 (quoting 705 ILCS 405/2-18(1) (West 2008)). If the trial court answers the first question in the affirmative, *i.e.*, the minor is an abused, neglected, or dependent child, the court must move to step two—the dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21, 981 N.E.2d 336 (citing 705 ILCS 405/2-21(2) (West 2010)). "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *A.P.*, 2012 IL 113875, ¶ 21. Then, if the minor "is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2020).

¶ 24       On review, we will reverse a trial court's order if the findings stand against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991). "The finding of the trial court is against the manifest weight of the evidence if a

review of the record clearly demonstrates that the proper result is the one opposite that reached by the trial court." *In re M.K.*, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74, 79 (1995).

¶ 25 Here, Mother challenges the trial court's dispositional order as against the manifest weight of the evidence. She specifically argues the State failed to prove the abuse and neglect allegations. We disagree. Contrary to Mother's assertion, there was ample evidence to support the trial court's dispositional order, especially its abuse and neglect findings.

¶ 26 To prove K.S. was abused, the State had to prove by a preponderance of the evidence that Mother inflicted or allowed to be inflicted upon K.S. a physical injury by other than accidental means that caused K.S. to suffer disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. See 705 ILCS 405/2-3(2)(i) (West 2020). Mother reasons that since the trial court's adjudicatory order noted " '[n]o plausible explanation was provided for the *** injuries,' " then "it follows the court could not reasonably conclude either that [Mother] inflicted the injuries or allowed them to be inflicted or that the injuries were (or were not) the result of accidental means." Mother's reasoning is flawed. Her brief plucks half of one sentence from the trial court's order and centers a whole argument on it. In full context, the trial court's order said: "No plausible explanation was provided for the acute injuries on 1/5/2021, *but the trauma happened in the home with [Mother] present in the residence*." (Emphasis added.) And that sentence concluded a paragraph discussing K.S.'s injuries and Mother's "multiple conflicting explanations for how the injuries occurred." It merely served as a summation of the facts.

¶ 27 More importantly, though, the trial court did not rest its decision solely upon Mother's failure to provide a plausible explanation for K.S.'s injuries; rather, it based its abuse finding "on the medical findings, the expert opinion of Dr. Reifsteck, *and* the inconsistent

statements of [Mother]." (Emphasis added.). Indeed, medical findings showed K.S. sustained significant injuries: a femur fracture and subconjunctival hemorrhages. Nurse Kieffer testified K.S.'s leg looked deformed. Medical evidence further showed K.S. had old, healed fractures to her ribs and clavicle. All told, the medical evidence confirmed K.S. sustained disfigurement and a physical impairment while in Mother's care. See 705 ILCS 405/2-3(2)(i) (West 2020). Moreover, the medical evidence confirmed that K.S.'s physical impairment and disfigurement were not accidental. Dr. Reifsteck's testimony indicated none of those injuries could have happened by accident but were inflicted injuries, likely from squeezing, shaking, or throwing K.S. Even Mother's testimony indicated she suspected her paramour, whom she allowed to stay in the apartment with her and K.S., intentionally inflicted K.S.'s injuries. See 705 ILCS 405/2-3(2)(i) (West 2020). In finding K.S. abused, the trial court clearly credited the medical evidence and Dr. Reifsteck's testimony, as is its prerogative to do. See *T.B.*, 215 Ill. App. 3d at 1062. A preponderance of the evidence, therefore, supported the court finding K.S. to be an abused minor pursuant to section 2-3(2)(i) of the Juvenile Court Act because she suffered significant nonaccidental physical impairments.

¶ 28　　　　To prove K.S. was neglected, the State had to prove by a preponderance of the evidence that K.S.'s "environment is injurious to [her] welfare when [she] resides with [Mother] in that [she] has sustained injuries of such a nature as would not ordinarily be sustained or exist except by reason of acts or omissions of [Mother]." Neglect can look different in various cases because it is a fact-specific inquiry. *In re Arthur H.*, 212 Ill. 2d 441, 463, 819 N.E.2d 734, 746 (2004). Though "neglect" has no " 'fixed and measured meaning' " (*Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346, 730 N.E.2d 1086, 1090 (2000))), it is "[g]enerally *** defined as the failure to exercise the care that circumstances justly demand." (Internal quotation

marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. Likewise, "injurious environment" is "an amorphous concept" in Illinois law, but "has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. Mother aims a two-pronged attack on the trial court's finding of neglect by alleging, first, the evidence did not support the trial court's findings that K.S. had visible injuries and was in extreme pain, and second, the evidence does not support a conclusion K.S. lived in an injurious environment. We disagree on both points.

¶ 29        First, the evidence supported the trial court's findings K.S. had obvious injuries and appeared to be in pain during the whole day. Mother testified that before she took K.S. to the hospital, she could tell K.S. was in pain and could not soothe her. Moreover, Nurse Kiefer treated K.S. in the emergency room and testified K.S. "appeared to be in a lot of pain. She was crying, extremely irritable and restless." Kiefer "noticed right away that [K.S.'s] leg looked very deformed," with "a large bulge on the upper thigh." Second, the trial court's finding K.S. suffered an obvious injury and pain supports a conclusion K.S. lived in an injurious environment when residing with Mother. Mother had a duty to ensure K.S.'s safety, and she did not do that. See *Arthur H.*, 212 Ill. 2d at 463. There was no explanation for K.S.'s injuries except that Mother breached her duty to care for K.S. Based on the specific facts and circumstances before it—K.S. sustaining significant injuries while in Mother's care—the trial court rightly found that Mother failed to exercise care to ensure her child's safety, making K.S. a neglected minor under Illinois law. See 705 ILCS 405/2-3(1)(b) (West 2020); *Arthur H.*, 212 Ill. 2d at 463.

¶ 30        Reviewing this record, we cannot conclude the trial court's dispositional order stands against the manifest weight of the evidence. Particularly, we cannot say the trial court should have reached the opposite result. See *M.K.*, 271 Ill. App. 3d at 826. Based on the

evidence, the trial court rightly found K.S. an abused and neglected minor and reasonably believed the most prudent course was to keep K.S. in DCFS's custody while Mother completed services. We agree.

¶ 31                                    III. CONCLUSION

¶ 32            For the reasons stated, we affirm the trial court's judgment.

¶ 33            Affirmed.