NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251127-U

NOS. 4-25-1127, 4-25-1128 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.G.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | Nos. 25JA31 |
| v.  (No. 4-25-1127) | ) | 25JA32 |
| Joshua R., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* E.R., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.  (No. 4-25-1128) | ) | Honorable |
| Joshua R., | ) | John Brian Goldrick, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court did not abuse its discretion by entering a dispositional order finding respondent unfit.

¶ 2    Respondent, Joshua R., is the father of J.G.B. (born July 2012) and E.R. (born March 2012). (We note that E.R.'s mother is deceased and J.G.B.'s mother, Jennifer B., is not part of this appeal.) In April 2025, the State filed petitions for adjudication of wardship, alleging that J.G.B. and E.R. were (1) abused in that Joshua (a) caused physical injury to J.G.B. (705 ILCS 405/2-3(2)(i) (West 2024)) and (b) inflicted excessive corporal punishment upon J.G.B.

(*id.* § 2-3-(2)(v)) and (2) neglected due to an injurious environment caused by (a) Joshua's "UNRESOLVED ISSUES OF ANGER MANAGEMENT" (*id.* § 2-3(1)(b)) and (b) Jennifer's "UNRESOLVED ISSUES OF ALCOHOL AND /OR SUBSTANCE ABUSE" (*id.*).

¶ 3          That same month, the trial court conducted a temporary custody hearing and placed the minors in the temporary custody of the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 4          In August 2025, the trial court adjudicated the minors neglected, and in October 2025, the court entered a dispositional order (1) finding Joshua unfit and unable for reasons other than financial circumstances alone to care for J.G.B. and E.R. and (2) placing custody of the minors with DCFS.

¶ 5          Respondent appeals, arguing that the trial court abused its discretion by "selecting a more restrictive custodial placement than the evidence required." We disagree and affirm.

¶ 6                                    I. BACKGROUND

¶ 7                          A. The Petitions and the Temporary Custody Hearing

¶ 8          In April 2025, the State filed petitions for adjudication of wardship, alleging that J.G.B. and E.R. were abused and neglected. Specifically, the petitions alleged that both minors were (1) abused because Joshua inflicted excessive corporal punishment on J.G.B. by pushing, hitting, and squeezing her, resulting in physical injuries to her face and bruising to her arm (*id.* §§ 2-3(2)(i), (v)) and (2) neglected due to (a) Joshua's "UNRESOLVED ANGER MANAGEMENT ISSUES" and (b) Jennifer's "UNRESOLVED ISSUES OF ALCOHOL AND /OR SUBTANCE ABUSE" (*id.* § 2-3(1)(b)).

¶ 9          That same month, the trial court conducted a temporary custody hearing and placed both minors in the custody of the guardianship administrator of DCFS.

¶ 10                              B. The Adjudicatory Hearing

¶ 11          In August 2025, the trial court conducted an adjudicatory hearing. Jennifer

admitted the allegation in the petition relating to her unresolved substance abuse issues. As a

factual basis, the State asserted that Jennifer had a 10-year history of alcohol and cocaine abuse

and three rehab attempts, and the children were previously removed from her custody for this

reason.

¶ 12          After accepting Jennifer's admission, the trial court asked the State what it

intended to do with the allegations relating to Joshua. The State answered, "Strik[e] them."

Joshua's attorney did not object. The court declined the State's request and continued the case

for a dispositional hearing, at which the parties would provide a reason why those counts should

be dismissed.

¶ 13                              C. The Dispositional Hearing

¶ 14          In September 2025, the trial court conducted a dispositional hearing, first

addressing the State's motion to dismiss the allegations relating to Joshua. The State asserted the

following:

> "I think it is in the children's best interest for services to begin as soon as
>
> possible. We can see in the case worker's report that [Joshua] is reluctant to start
>
> his services until after the dispo[sitional hearing], until after he's been found fit or
>
> unfit. And I think it is in the children's best interest to move on to do the dispo
>
> today to, if [Joshua] is found unfit, begin service as soon as possible, and be
>
> working for reunification on the normal timeline.
>
> So, my recommendation is that you allow me to dismiss the remaining
>
> count because we have hung our hats on the neglect count and services will be

provided to all parents. And the services are not dependent on which count it is submitted to."

¶ 15        The guardian *ad litem* (GAL) stated that she agreed with the State and wanted "this case to be disposed of as soon as possible so that the services can really get on the way." The GAL also advised the trial court that the children had expressed a desire to speak with the judge in person.

¶ 16        The trial court noted that it had reservations about dismissing the allegations relating to Joshua, given "the underlying reason why this case started." The court then (1) noted that J.G.B. and E.R. were teenagers who were able to "present their thoughts and opinions on what they would like to have happen" and (2) continued the matter to speak to the minors.

¶ 17                1. *The Trial Court's In Camera Conversation With the Minors*

¶ 18        In October 2025, the trial court resumed the dispositional hearing. At the beginning of the hearing, the court dismissed the allegations relating to Joshua "at the request of the parties."

¶ 19        The trial court then noted that it had spoken with both minors and summarized the conversation for the parties. The court stated that it asked J.B.G. how she felt about her father. She told the court she did not believe he was a bad person, but she "said she thinks that he needs some help." The court also asked J.G.B. about the incident giving rise to the petition, during which her father "disciplined" her, causing injury. J.G.B. told the court what happened from her perspective and told the court "she was afraid." The court stated, "[T]he long and the short of it is, she's not at a point where she's ready to visit with her dad," although she was "fairly positive" she would like to do so "at some point in time."

¶ 20        The trial court then recounted its conversation with E.R., noting that E.R. "wants

- 4 -

to go back to his dad, but he believes that his dad needs to work on—and it was his word—his anger issues." E.R. also "expressed concern for the well-being of [J.G.B.]" The court noted that both minors "told me that they love their dad," but "they think there are some things that Dad needs to work on with regards to his anger."

¶ 21                                    2. *The Dispositional Report*

¶ 22          The trial court next confirmed that the parties had all received the dispositional report, which was prepared by the caseworker and filed September 16, 2025. Regarding the "reason for involvement," the report noted the following:

> "[In March 2025, J.G.B.] eloped from her home and it was reported that she was physically assaulted by her father after he found a cellular phone in her possession that she was not allowed to have. He pushed her onto her bed, placed all his weight on her, grabbed and squeezed her head with both hands while scratching her face cheeks. It was also reported that he attempted to strangle her."

¶ 23                                    a. Joshua

¶ 24          Regarding Joshua, the report noted that he "originally refused to participate in an integrated assessment," but he agreed to participate in June 2025. Joshua previously had a dependency on opioids and methamphetamines but reported being sober for 16 years. He had a criminal history that included four assault convictions, one "Dangerous Drugs" conviction, two larceny convictions, and one obstructing justice conviction. Joshua has never had any mental health diagnosis or treatment, although he had been prescribed an antidepressant when he first obtained sobriety.

¶ 25          The report noted that Joshua "initially refused all services recommended by the agency" because he believed it would be " 'admitting fault and guilt in the child welfare case.' "

However, in August 2025, he agreed to participate, and the necessary consents and referrals for substance abuse, anger management, and mental health assessments were signed and submitted to Chestnut Health Systems by early September 2025. Joshua also completed a parenting assessment in late August 2025. Additionally, Joshua participated in nine drug screens between July and September 2025, six of which were negative. Of the remaining three, Joshua twice failed to appear but called the caseworker to report he forgot to call the "drop line," and once he appeared but no worker was present to administer the test.

¶ 26　　　　Regarding visitation with the minors, the report noted that both J.G.B. and E.R. "ha[d] been refusing visits with [Joshua]." J.G.B. had "reported *** on multiple occasions that she only wants to have a visit with [Joshua] so she can 'cuss him out and say she never wants to see him again.' " E.R. "reported being very hesitant to do any visits and told [the caseworker] he has blocked [Joshua] on all social media accounts." On the advice of his attorney, Joshua wrote letters to both children in late August 2025, after which E.R. stated he wanted to visit with Joshua. At the time of the report, those visits were occurring weekly for two hours at the agency.

¶ 27　　　　The caseworker also reported that, while visiting with another of his children (who is not a part of this appeal), the agency had security on the premises "as a precaution" following unspecified "concerns." Joshua commented, " 'If I want to walk out right now with my daughter, that security guard ain't gonna stop me.' " Regarding J.G.B. and E.R., Joshua was not told where they were staying; Joshua told the caseworker that he had conducted his " 'own investigation,' " and he would just " 'show up if he wanted to.' "

¶ 28　　　　　　　　　　　　　　　b. E.R.

¶ 29　　　　The dispositional report noted that E.R. "was born with drugs in his system" and he lived with his mother until she died in 2017, at which time he went to live with Joshua.

Although E.R. did not have any "known behavioral diagnoses," he had been hospitalized in June 2025 due to "having homicidal ideation of hurting fellow peers." E.R. was also diagnosed with autism spectrum disorder. According to the report, E.R. "has experienced trauma and adversity, including the death of his mother," as well as "physical, verbal, and emotional abuse." He "expressed to the integrated screener that he is fearful of his father" and "vocalized *** that he does not feel safe at his father's home and is very hesitant to have any further communication with his father."

¶ 30                                    c. J.G.B.

¶ 31          Regarding J.G.B., the report noted that she was seen in the emergency room following the incident with her father, complaining of a headache, and "[s]cratches and bruises were observed at this visit." J.G.B. lived with her mother until 2019, when DCFS removed her from her mother's home due to substance abuse. At that time, J.G.B. began living with Joshua. The report stated that J.G.B. had "experienced significant trauma and adversity" throughout her life, "including being removed from her mother's care due to her mother's substance use issues and neglect, physical abuse, emotional abuse, verbal abuse, sexual abuse and exposure to domestic violence dynamics." J.G.B. had been prescribed medication for anxiety and in the past demonstrated self-harming behaviors, such as cutting her arms and thighs, although she was demonstrating "[n]o problematic behaviors" in her foster home.

¶ 32                              d. Recommendations

¶ 33          The dispositional report recommended that (1) Joshua be found unfit, (2) custody and guardianship of J.G.B. and E.R. be placed with DCFS, and (3) the trial court set a permanency goal of return home in 12 months.

¶ 34                              3. *Joshua's Testimony*

¶ 35　　　　　Joshua testified at the dispositional hearing. He denied ever hitting either of the minors and asserted that J.G.B. lied about Joshua pushing, hitting, or squeezing her. He stated that she made up the story as retaliation or "manipulation" after he disciplined her by taking her phone away from her. He admitted, however, that he did yell and scream at her.

¶ 36　　　　　When Joshua was asked whether he believed whether it was in E.R.'s best interest to return to his home, Joshua answered, "Absolutely." But when asked whether he believed it was in J.G.B.'s interest to return to his home, Joshua answered, "I don't know. I'm—I'm afraid if she does come home, she's just going to try to do this again, so." He also believed that J.G.B. needed mental health counseling, stating, "She's got some schizophrenia going on."

¶ 37　　　　　Joshua's attorney asked him, "So you think it's best that she stay where she is?" Joshua answered as follows:

> "I don't know what's best as far as that. My—I know my son is ready to come home. I love my son. I love my daughter. But she definitely needs help, and I would be afraid—I would let her come back to me, but I would be afraid that she would do this again. Absolutely."

¶ 38　　　　　The trial court asked Joshua questions about how he disciplined E.R. and J.G.B. When the court asked Joshua if he ever used "physical discipline, or corporal punishment" on either of the children, which the court explained included spanking with an open hand or object, Joshua answered, "Never." When the court replied by telling Joshua that both minors said that he "used [an] open in hand in the face as a means of *** disciplining," Joshua again denied that he had ever done so. When the court asked whether E.R. and J.G.B. were lying about Joshua hitting them, Joshua answered that the minors were "[n]ot telling the truth."

¶ 39　　　　　4. *The Arguments and the Trial Court's Ruling*

¶ 40　　　　　The State and the GAL recommended that the trial court find Joshua unfit to protect, care for, train, and discipline the minors and place custody of both minors with DCFS.

¶ 41　　　　　The GAL, in particular, noted that Joshua loved his children and his children loved him, but "there is some work that needs to be done" in counseling. She emphasized that the minors had each been interviewed separately in separate homes and "they were both consistent [that] *** when [Joshua] gets angry, it's scary and intimidating." The GAL also asserted that J.G.B. also was exhibiting "behaviors" that "need[ed] to be addressed with her in counseling." As a result, the GAL opined that it was "too soon to return the kids home," but she expressed optimism that the children could be returned home to Joshua after some of the "issues that were escalating" could be addressed.

¶ 42　　　　　Joshua's counsel argued that E.R. should be returned to the custody of his father but said the following regarding J.G.B.:

> "[Joshua] believes that he is fit, and that [J.G.B.] should come home, but he's scared to have her come home, that this might happen again. So, until she's ready and gets counseling, maybe it's best that she remain in her current placement. But if the Court thinks she should be returned home, that's good, too."

¶ 43　　　　　The trial court then addressed Joshua, noting that J.G.B. and E.R. were different children who required different types of discipline. The court acknowledged that E.R. was "a lot easier to deal with" than J.G.B., who "requires more work on your behalf." Nonetheless, the court observed that both minors, who were interviewed separately by the court, "expressed concerns about your anger. It obviously has an impact on two 13-year-olds." The court continued as follows:

> "So, while you may mean nothing by it, looking at it from the perspective

of a 13-year-old, it's concerning to them. It bothers them. *** I imagine the times when you get upset, you raise your voice. And, as you have already said, you're an intimidating man. You're a large man. Six-foot-whatever, 200-whatever, and your kids are small. ***

Both of them told me, and you deny it here today, that you have put your hands on them in what I would characterize as a form of discipline, with an open hand [to] the face. Even [E.R.] has said that, and told me that. Is it the worst thing in the world[, Joshua]? I don't think it is.

I agree, I don't think you, with a closed fist, hauled off and hit somebody in the side of the head. I don't think that occurred. But I think on that date in question, I think you put your hands in [J.G.B.'s] face, and that's what led to all of this. It could have happened before. And that's what creates the fear in her.

Does she have things she needs to deal with? Absolutely. *** And she's afraid to be with you, but she didn't say, I don't ever want to be with my dad; *** I don't want to be around him. She didn't say that. It's the anger that concerns the children.

Like I said, is [E.R.] a little differently situated? May he be able to let things roll off his back better than [J.G.B.] did? Possibly. But again, it's still something that needs to be addressed.

The comprehensive assessment of needs and strengths that was done indicated that [Joshua], as he's testified, doesn't require traditional domestic violence counseling; that's not the type of case we have. He doesn't require substance abuse treatment. And as he's already testified to, he's a person who has

recovered.

I don't think there's a substance abuse issue. I didn't believe that when we started. The screening has been done to make sure that it's not an issue. It's not to single you out, [Joshua]. A lot of times, it's traditional course with these backgrounds to make sure that there isn't an issue. Do I think the agency needs to screen anymore? I don't. I don't think that's the issue. Okay?

How will you discipline and address your children's shortcomings and problems—it's different for 13-year-olds than it is for a 5-, 6-, or 7-year-old. Discipline doesn't work the same for a younger child as it does for an older child.

[E.R.] probably doesn't require much in discipline, based upon my assessment, but [J.G.B] probably does need more discipline than [E.R.] from [Joshua's] perspective, and probably because she's—I'll just simply, in a general sense, say, as I've already said, she's got a lot more to deal with.

\*\*\*

My question today is, can I return either or both of these children, with the confidence that the environment that they return to will be healthy, and not endanger their well-being. That is my concern. That's the issue that I have to look at.

\*\*\*

\*\*\* [Joshua] is required to engage in the counselling—or recommended to engage in the counselling to address what I would characterize as anger issues; and he's also suggested to engage in parenting classes. \*\*\*

\*\*\*

- 11 -

I do think there needs to be family counseling in a generic sense, and that [Joshua] is able to sit down, quite frankly, independently, with [E.R.] and ultimately with [J.G.B]. Probably a closer thing to deal with [E.R.] than it is with [J.G.B.] at this point in time.

The question is, do I return either of the children to you today? And I will just say, [Joshua], I'm not prepared to do that today.

\*\*\*

\*\*\* I'm going to need to see how counseling goes; whether there's any concerns about parenting; how we discipline; because I do believe what the children told me. I don't think it's the end of the world—I don't think it's the worst form of discipline, but it obviously bothers the children. Maybe not so much [E.R.]

But I'm not returning the children today. The question is, is it unfit? Unable? I think it's a combination of both, not because I think [Joshua] is a monster, a horrible person. But I'm certainly—I'm not—I'm not going to place [J.G.B.] with you when you're telling me you are concerned with things happening again, but that's the only reason why I'm place—place her today, is because of those concerns. It tells me that there are issues that she needs to work on herself to get to the point where she can talk to you about her concerns, and have the opportunity to interact. Simply put, that's going to take a little more time than it does with [E.R.]"

The court noted that it supported increasing contact and visitation with E.R. and returning in 60 days to assess progress in counseling and determine if the court could return E.R. at that time.

¶ 44		The trial court entered a written dispositional order (1) finding Joshua unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, and discipline the minors and (2) placing custody and guardianship of the minors with the guardianship administrator of DCFS. The court's written order also found that placement with Joshua was "contrary to the health, safety and best interest of the minors because he needs [to] maintain sobriety, counseling for anger issues, family counseling, mental health, and needs parenting teens classes."

¶ 45		This appeal followed.

¶ 46		                    II. ANALYSIS

¶ 47		Respondent appeals, arguing that the trial court "abused its discretion by selecting a more restrictive custodial placement than the evidence required." Specifically, Joshua asserts that the court should have entered a dispositional order returning the minors to his care "under continued supervision" because the adjudicatory allegations relating to him were dismissed and he had "already begun" addressing the court's concerns about "anger management and parenting strategies for adolescents." He contends that the court abused its discretion by "bypass[ing]" this "less restrictive, statutorily authorized alternative *** without finding that the children's health or safety would be jeopardized by such an arrangement." We disagree.

¶ 48		                    A. The Applicable Law

¶ 49		After a trial court adjudicates a minor neglected, it must conduct a dispositional hearing, during which "the court must first determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court." *In re M.M.*, 2016 IL 119932, ¶ 17; 705 ILCS 405/2-21(2), 2-22(1) (West 2024). If the minor is made a ward of the court, the court shall fashion a dispositional order that best serves the interest of the minor. *In re J.W.*, 386

- 13 -

Ill App. 3d 847, 856 (2008) (citing 705 ILCS 405/2-22(1) (West 2006)).

¶ 50     "All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-22(1) (West 2024).

¶ 51     Section 2-23(1) of the Juvenile Court Act of 1987 (Act) (*id.* § 2-23(1)) authorizes four basic types of dispositional orders: (1) continued in the care of the minor's parent, guardian, or legal custodian; (2) restored to the custody of the minor's parent, guardian, or legal custodian; (3) ordered partially or completely emancipated; or (4) placed in accordance with section 2-27 of the Act.

¶ 52     Section 2-27(1) of the Act permits the trial court to place the minor in the custody of a third party, such as DCFS, if the court makes a written finding that the parent, guardian, or legal custodian is "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor or are unwilling to do so" and "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents, guardian or custodian." *Id.* § 2-27(1).

¶ 53     "On review, a trial court's dispositional determination will be reversed only if the court abused its discretion by selecting an inappropriate dispositional order." *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011). "A trial court abuses its discretion when no reasonable person would agree with its decision." *Id.*

¶ 54                    B. This Case

¶ 55     Although we agree with Joshua that the Act "authorized" the trial court to fashion a dispositional order continuing the minors in his care, the Act also authorized the court to place the minors with a third party upon a finding of parental unfitness. However, the question is not

- 14 -

what disposition was authorized, but what disposition was appropriate. Based upon our review of the record, we conclude that the court's dispositional order was manifestly appropriate and did not constitute an abuse of discretion.

¶ 56   At the dispositional hearing, the trial court received evidence that the case commenced after J.G.B. reported her father physically assaulted her while disciplining her for possessing a cell phone. J.G.B. stated that her father (1) grabbed and squeezed her head and scratched her cheeks and (2) attempted to strangle her. Emergency room observations of scratches and bruises corroborated J.G.B.'s account.

¶ 57   Although Joshua denied ever hitting either of the minors, the trial court noted during its ruling that both minors told the court directly that Joshua has disciplined them "with an open hand [to] the face," and the court found the minors credible on that point. Joshua admitted that he yelled and screamed at J.G.B. and acknowledged that he was a large and intimidating man. Joshua also had four prior assault convictions, in addition to other nonviolent convictions.

¶ 58   Importantly, Joshua, J.G.B., and E.R. all seemed to agree that returning the minors to Joshua's custody at the time of the dispositional hearing was premature, but that it could occur in the foreseeable future after some progress was made in services. Both minors expressed that Joshua had anger issues that he needed to work on. When J.G.B. spoke with the trial court, she stated she was not ready to even visit with Joshua yet, let alone return to his care. Joshua testified J.G.B. needed "help," and he was "afraid" that if she was returned home, she might "do this again." Joshua's attorney argued it might be best that J.G.B. remain in her current placement for the time being.

¶ 59   At the time of the dispositional hearing, Joshua had not yet made substantive progress in his services. Although he had completed a "Comprehensive Assessment of Needs

and Strengths" at Chestnut Health Systems and was recommended to complete outpatient mental health counseling, with a focus on anger management and domestic violence, he had attended only one counseling session, which occurred the week before the hearing. He had also been recommended to complete parenting classes.

¶ 60     The trial court was correct to require demonstrative progress in those services prior to returning the minors to Joshua's care. The dispositional report noted that both J.G.B. and E.R. had experienced trauma throughout their young lives, making a calm and stable living environment a crucial consideration for the court when determining their best interest. The record shows that the court carefully considered the needs of each child and issued a detailed and helpful ruling explaining its dispositional order.

¶ 61     Last, we note that, although the allegations in the petitions for adjudication of wardship relating to Joshua's discipline were dismissed, it is well-established that the trial court, during an adjudicatory hearing, determines "whether the child is neglected, and not whether the parents are neglectful." *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). Moreover, a trial court's written adjudicatory findings do "not adjudicate a parent or guardian 'guilty' but, instead, constitute[ ] simply one of the numerous factors the court will consider at the later dispositional hearing." *J.W.*, 386 Ill. App. 3d at 855.

¶ 62     Additionally, Joshua testified at length during the dispositional hearing about J.G.B.'s allegations and his disciplinary practices, generally. As such, despite their dismissal for adjudicatory purposes, Joshua had a full and fair opportunity to address the allegations prior to the trial court's fashioning of the dispositional order.

¶ 63     For the foregoing reasons, we conclude that the trial court's dispositional order was manifestly appropriate and did not constitute an abuse of discretion.

¶ 64                              III. CONCLUSION

¶ 65        For the reasons stated, we affirm the trial court's judgment.

¶ 66        Affirmed.